**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

DUSA PHARMACEUTICALS, INC.

       Plaintiff

   v.

BIOFRONTERA INC.,  BIOFRONTERA
BIOSCIENCE GMBH, BIOFRONTERA
PHARMA GMBH, BIOFRONTERA
DEVELOPMENT GMBH, BIOFRONTERA
NEUROSCIENCE GMBH, AND
BIOFRONTERA AG,

       Defendants.

Civil Action No. 1:18-cv-10568-RGS

**JURY TRIAL DEMANDED**

**PLAINTIFF DUSA PHARMACEUTICALS, INC.'S
OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.   RELEVANT LEGAL AUTHORITY ......................................................................... 1

III.  OVERVIEW OF THE ASSERTED PATENTS........................................................ 2

   A.  The Problem In The Prior Art................................................................................ 4

   B.  The '991 and '289 Patents' Solution ..................................................................... 4

   C.  Level of Ordinary Skill ......................................................................................... 7

IV.  ARGUMENT ON DISPUTED CLAIM CONSTRUCTIONS................................... 7

   A.  "Illuminator" ......................................................................................................... 7

   B.  "Plurality of light sources configurable in a spaced relationship to the patient"........... 10

   C.  "All operation distances" .................................................................................... 11

   D.  "Uniform output of light" and "The light sources are configured and controlled to
       provide a uniform output of at least one of blue light and red light".............................. 13

V.   CONCLUSION....................................................................................................... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*August Tech. Corp. v. Camtek, Ltd.*,
   655 F.3d 1278 (Fed. Cir. 2011)..................................................................................................10

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006)....................................................................................................10

*Exxon Research & Eng'g Co. v. U.S.*,
   265 F.3d 1371 (Fed. Cir. 2001)..................................................................................................14

*Keurig, Inc. v. JBR, Inc.*,
   No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 40341 (D. Mass. Mar. 22, 2013).................10, 11

*Koninklijke Philips N.V. v. Wangs Alliance Corp.*,
   No. 14-12298-DJC, 2017 U.S. Dist. LEXIS 202912 (D. Mass. Dec. 11, 2017) ......................2

*Mass. Inst. of Tech. v. Shire Pharms., Inc.*,
   839 F.3d 1111 (Fed. Cir. 2016).............................................................................................13, 16

*MeadWestVaco Corp. v Rexam Beauty & Closures, Inc.*,
   731 F.3d 1258 (Fed. Cir. 2013)..................................................................................................13

*Medrad, Inc. v. MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005)..................................................................................................14

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011)........................................................................................................................2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014)..............................................................................................................2, 11

*Oatey Co. v. IPS Corp.*,
   514 F.3d 1271 (Fed. Cir. 2008)....................................................................................................8

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)..................................................................................................12

*ScriptPro LLC v. Innovation Assocs.*,
   833 F.3d 1336 (Fed. Cir. 2016)....................................................................................................8

*Sunrise Techs., Inc. v. Cimcon Lighting*,
   280 F. Supp. 3d 238 (D. Mass. 2017) ......................................................................................2, 11

*Typemock, Ltd. v. Telerik, Inc.*,
   No. 17-10274-RGS, 2018 U.S. Dist. LEXIS 149110 (D. Mass. Aug. 31, 2018) ......................2

**Statutes**

35 U.S.C. § 112 ............................................................................................................................15

## I.      INTRODUCTION

Since its creation in 1991, Plaintiff DUSA Pharmaceuticals, Inc. ("DUSA") has expended and continues to expend tremendous time, effort, and investment in researching, developing, testing, and ultimately offering in the United States novel photodynamic therapy ("PDT") treatments for a broad range of medical conditions. Specifically, DUSA's PDT therapy using Levulan® and its BLU-U® illuminator is the first FDA-approved treatment of its kind for patients with actinic keratosis, and DUSA has been the leader in this field since launching its product in the early 2000s. Prior to DUSA's pioneering efforts, conventional approaches to using PDT to treat skin conditions did not yield therapeutic treatments that warranted the multi-phase clinical trials and FDA approval process DUSA pursued. Indeed, the state of the art at the time was not focused on refining the light device as described in the present invention, the component of DUSA's successful PDT therapy necessary to activate DUSA's Levulan® drug. The inventors of the patents at issue here, however, did take such notice, and—as taught by DUSA's patents—they recognized that for PDT to be truly effective in this field, a treatment system needed to effectively control for the light emitted onto a patient, including the uniformity of its spectral output and intensity.

DUSA's proposed constructions of the terms at issue here seek to remain true to the scope of the invention as described by the claim language, specification, and intrinsic record, and as understood by a person of ordinary skill in the art at the time of the invention. Biofrontera's proposed constructions—in contrast—do not. Biofrontera instead asks the Court to view terms in a vacuum—divorced from the intrinsic evidence and from what one of ordinary skill would understand the disputed claim terms to mean. For the reasons set forth below, DUSA respectfully requests that the Court adopt DUSA's proposed constructions.

## II.    RELEVANT LEGAL AUTHORITY

Like other invalidity defenses, indefiniteness must be proven by clear and convincing evidence by the party challenging validity. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011); *Typemock, Ltd. v. Telerik, Inc.*, No. 17-10274-RGS, 2018 U.S. Dist. LEXIS 149110, at *9 (D. Mass. Aug. 31, 2018). This burden of proving indefiniteness of a patent claim is not met when if, "read in light of the specification delineating the patent, and the prosecution history," the patent "inform[s], with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). The definiteness requirement also "must take into account the inherent limitations of language." *Id.* at 2128 (internal quotation marks omitted); *Koninklijke Philips N.V. v. Wangs Alliance Corp.*, No. 14-12298-DJC, 2017 U.S. Dist. LEXIS 202912, at *10 (D. Mass. Dec. 11, 2017). Further, "indefiniteness should be resolved at the summary judgment stage rather than upon claim construction." *Sunrise Techs., Inc. v. Cimcon Lighting*, 280 F. Supp. 3d 238, 247 (D. Mass. 2017) (holding at claim construction that "the Court will postpone any indefiniteness determinations for a later stage").

## III.    OVERVIEW OF THE ASSERTED PATENTS

DUSA's two asserted patents, U.S. Patent No. 9,723,991 ("the '991 patent") and U.S. Patent No. 8,216,289 ("the '289 patent"), both entitled "Illuminator for Photodynamic Therapy," claim priority back to applications filed in May 1998.[1] This family of patents concerns a novel

---

[1] Specifically, the '991 patent application is a continuation of U.S. Patent Application No. 13/484,691 (issued as U.S. Patent No. 8,758,418), which is a continuation of U.S. Patent Application No. 12/969,999 (issued as the asserted '289 patent), which is a continuation of U.S. Patent Application no. 12/621,845 (issued as U.S. Patent No. 8,030,836), which is a continuation of U.S. Patent Application No. 11/716,014 (issued as U.S. Patent No. 7,723,910), which is a continuation of U.S. Patent Application No. 10/755,318 (issued as U.S. Patent No. 7,190,109), which is a divisional of U.S. Patent Application No. 09/774,084 (issued as U.S. Patent No. 6,709,446), which is a divisional of U.S. Patent Application No. 09/070,772 (issued as U.S. Patent No. 6,223,071).

approach to photodynamic therapy to treat or diagnose skin conditions, such as actinic keratosis (scaly patches on the skin due to sun exposure) on the scalp or facial areas of a patient. Ex. A[2] ('991 pat.) at 1:26-34.[3] More specifically, PDT is a type of treatment that utilizes a light device to activate light-sensitive molecules to trigger chemical reactions that in turn are used to treat patients with skin conditions. One such molecule is 5-aminolevulinic acid ("ALA") which, when applied to the skin and activated by light at a specific wavelength and under certain conditions, causes a photosensitizer (such as a chemical called protoporphyrin IX) to be produced within specific cells. This photosensitizer, in turn, selectively targets and treats certain cells. *Id.* at 1:40-2:10; *see also* Declaration of Dr. Robert Zamenhof (hereinafter, "Zamenhof Decl.") at ¶¶ 21-22. This special light device is the focal point of the asserted patents. Here, the asserted '991 and '289 patented inventions are directed to properties specific to the output of the light device.

However, this patent family includes more than a hundred issued patent claims across eight patents, encompassing distinct inventions concerning the PDT light device. Other patents in the patent family and not asserted in this litigation are directed more specifically to the shape of the light device. For example, U.S. Patent No. 6,709,446 claims an invention directed specifically to a light device that includes "an arc-shaped portion" and that is "configured to conform to a portion of a patient . . . ." Ex. C (U.S. Patent No. 6,709,446) at claim 1. As another example, U.S. Patent No. 6,233,071 claims an invention directed to "a plurality of light sources generally conforming to the contoured surface and irradiating the contoured surface . . . ." Ex. D (U.S. Patent No. 6,223,071) at claim 1.

---

[2] All exhibits cited herein are attached to the Declaration of Jeremy Saks in Support of DUSA's Opening Claim Construction Brief, unless otherwise noted.
[3] Because the '991 patent and '289 patent share the same specification, DUSA's citation to the '991 patent specification here and throughout this brief incorporates by reference the corresponding cite in the '289 patent.

3

### A.      THE PROBLEM IN THE PRIOR ART

Prior to DUSA's pioneering invention—as claimed in the '991 and '289 patents—conventional PDT approaches did not produce visible light sufficiently uniform to provide effective treatment of a patient—particularly in treating contoured surfaces of that patient. Ex. A ('991 pat.) at 2:42-44. The light devices that existed were simple in form and function. Some simply turned on visible light used in treatment through a snap switch. *Id.* at 2:25-28. Others, though designed to shine light on a patient, did not adequately account for the intensity of the light or its uniformity—resulting in variable results when treating patients and—in particular—a patient's skin where the target lesion often exists across a contoured surface. *Id.* at 2:11-17; *see also* Zamenhof Decl. at ¶ 23. In brief, although much of the industry's attention focused on developing the drug used in such PDT treatments, DUSA recognized efficacy was a function of a well-engineered light device as well. DUSA sought and received patent protection accordingly.

### B.      THE '991 AND '289 PATENTS' SOLUTION

The '991 and '289 patented invention brought to the fore what—prior to its creation—was not known or recognized as even relevant to the efficacy of PDT therapy for treating skin conditions, among other conditions. This invention recognized the need to control the output of light emitted onto a patient during PDT. Specifically, it recognized that the spectral output (color or wavelength) of the light, the intensity of the light, and the uniformity of these properties are important factors in treating patients using PDT. It also recognized a minimal threshold which a light device needed to satisfy in order to activate the target photosensitizers used to diagnose or treat patients. *See, e.g.*, Ex. A ('991 pat.) at 2:29-41; Zamenhof Decl. at ¶ 24.

Claim 1 of the '991 patent, for example, claims the following apparatus:

1.  An illuminator for diagnosing or treating a patient, comprising:

> a plurality of light sources configurable in a spaced relationship to a patient to treat or diagnose a dermatological condition,
>
> a controller, connected to the plurality of light sources, to control the light sources,
>
> wherein the light sources are configured and controlled to provide a uniform output of light to the patient to treat or diagnose a dermatological condition,
>
> the light sources being configured and controlled such that uniform output of light is provided when measured at distances of 2" and 4".

Ex. A ('991 pat.) at claim 1.

The '991 patent's dependent claims further add elements specific to measured physical characteristics associated with uniform output of light:

> 2. An illuminator as set forth in claim **1**, wherein measured output over an active emitting area is within 70% of a measured maximum at distances of 4" and 2".
>
> 5. An illuminator as set forth in claim **1**, wherein the spectral output of the illuminator substantially matches an absorption spectrum of protoporphyrin IX.
>
> 11. An illuminator as set forth in claim **1**, wherein measured output over an active emitting area is within 60% of a measured maximum over all operation distances.
>
> 12. An illuminator as set forth in claim **1**, wherein the light sources are configured and controlled to provide a uniform output of at least one of blue light and red light to the patient to treat or diagnose a dermatological condition.

*Id.* at claims 2, 5, 11, 12.

Claim 1 of the '289 patent, as another example, claims the following method:

> 1. A method of photodynamically diagnosing or treating a patient, comprising:
>
> Illuminating the patient with an illuminator whose measured output over an active emitting area is at least 60% of the measured maximum over all operation distances.

Ex. B ('289 pat.) at claim 1.

5

The '289 patent's dependent claims further add elements specific to the measured physical characteristics associated with measured light output at certain distances, among other things:

> 2. The method according to claim **1**, wherein the illuminator is configured such that measured output over the active emitting area is at least 70% of the measured maximum at distances of 4" and 2".
>
> 4. The method according to claim **1**, wherein the spectral output of the illuminator substantially matches the absorption spectrum of protoporphyrin IX.
>
> 7. The method according to claim **1**, comprising illuminating the patient to treat actinic keratosis.
>
> 16. The method according to claim **1**, wherein the illuminator is configured such that the measured output over the active emitting area is at least 70% of the measured maximum at distances between 4" and 2".
>
> 17. The method according to claim **1**, wherein the illuminator is configured such that the measured output over the active emitting area is at least 70% of the measured maximum at a distance of 4".
>
> 18. The method according to claim **1**, wherein the illuminator is configured such that the measured output over the active emitting area is at least 70% of the measured maximum at a distance of 2".
>
> 19. The method according to claim **1**, wherein the illuminator is configured such that the measured output over the active emitting area is at least 70% of the measured maximum at a distance between 4" and 2".

*Id.* at claims 2, 4, 7, 16, 17, 18, 19.

The '991 and '289 patents, moreover, do not limit the invention to a single embodiment. Rather, they describe the application of these novel properties—including ensuring and measuring a uniform output of light—to light devices containing a multitude of light sources, including those that are planar, and those that possess bulbs curved in shape. *See, e.g.*, Ex. A ('991 patent) at 3:43-51 (describing an illuminator containing light sources arranged "parallel to one another"); *Id.* at 5:51-59 (describing illuminators containing light sources that may be U-shaped tubes). The '991 and '289 patents also recognize that such illuminators—though variable in certain physical

6

characteristics such as the shape of a bulb, for example, or the use of red or blue light—all must be operated at a certain distance from a patient's skin, commensurate with the operation distances of the specific illuminator embodiment. Ex. A ('991 pat.) at 15:37-42, claims 1, 2, 11 (describing operation distances of one embodiment at distances of 2" and 4"); *see also* Zamenhof Decl. at ¶ 25.

### C.    Level of Ordinary Skill

DUSA contends that a person of ordinary skill in the art at the time of the invention would have at least a Bachelor of Science degree in physics or bioengineering (or equivalent experience) and at least 3 years of experience related to PDT and/or other light-based therapies (or equivalent) using non-laser light sources. This person may have also worked in collaboration with other scientists and/or clinicians who have had experience developing or administering to patients PDT and/or other light-based therapies.

## IV.    ARGUMENT ON DISPUTED CLAIM CONSTRUCTIONS

### A.  "Illuminator"

| Term | Claim(s) | DUSA's Construction | Biofrontera's Construction |
|---|---|---|---|
| "illuminator" | '991: claims 1-3, 5-7, 9-12<br><br>'289: claims 1-6, 16-19 | "a light emitting medical instrument" | "one or more light sources generally conforming to a contoured surface" |

DUSA's proposed construction for "illuminator" comports with the claim language, specification, and intrinsic record. The parties do not dispute that an illuminator is a light emitting instrument, and that the instruments described and claimed in the asserted patents are medical devices. *See* Ex. A ('991 pat.) at Abstract; Ex. B ('289 pat.) at Abstract. Instead, Biofrontera's proposed construction of "illuminator" improperly imports details from one of several disclosed embodiments, whose shape "generally conform[s] to a contoured surface."

Nothing in the intrinsic record suggests that the inventions of the asserted patents *must* be "conforming to a contoured surface," nor that "illuminator" has some special narrow meaning in

these claims. Instead, the asserted patents disclose one embodiment of an illuminator which "*may* comprise generally U-shaped fluorescent tubes." Ex. A ('991 pat.) at Abstract (emphasis added); *see also id.* at 6:29-31; Ex. B ('289 pat.) at 6:16-17 ("[O]ne embodiment of the present invention utilizes a plurality of U-shaped tubes."). While the specification states how an object of the invention "is to provide an illuminator for PDT that produces visible light of consistent uniformity . . . over a diversely contoured surface," it does not require the illuminator to also be contoured to achieve this purpose. *See* Ex. A ('991 pat.) at 2:50-53. Figure 1 of the '991 patent depicts one embodiment, in which the light sources are U-shaped and enclose the front of the facial treatment area. *See id.* at Fig. 1. But as the patent states, the light sources *may* be generally U-shaped, and the specification is abundantly clear that U-shaped light sources designed to surround a facial treatment area of a patient is just one embodiment. *See, e.g., id.* at Abstract; 5:35-36 ("According to one preferred embodiment illustrated in FIGS. 1-8, seven U-shaped fluorescent tubes . . . ."); 6:29-31 ("[O]ne embodiment of the present invention utilizes a plurality of U-shaped tubes.").

"But a specification's focus on one particular embodiment or purpose cannot limit the described invention where that specification expressly contemplates other embodiments or purposes." *ScriptPro LLC v. Innovation Assocs.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016). Indeed, Biofrontera's proposed construction reads out other embodiments described in the '991 and '289 patent specification. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification. . . . At leas[t] where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary"). In particular, the specification describes an embodiment of the

illuminator that is an "infinite plane emitter"[4] and with light sources that are "generally parallel to one another":

> "[T]here is also provided according to the present invention an illuminator for emulating *an infinite plane emitter*. The illuminator comprises an emitting area having a perimeter, *and a plurality of light sources being generally parallel to one another*, said plurality of light sources being adapted for irradiating substantially uniform intensity light from said emitting area. Lateral spacing between adjacent ones of said plurality of light sources varies with respect to said perimeter."

Ex. A ('991 pat.) at 3:43-51; Ex. B ('289 pat.) at 3:36-44 (emphasis added). Thus, the specification describes an alternative illuminator that contemplates a "planar" or "parallel" arrangement of the light sources that imposes no requirement that the illuminator conform to a contoured surface. Biofrontera's approach would improperly read this arrangement out of the claim's scope. *See also* Zamenhof Decl. at ¶¶ 28-29.

Biofrontera appears to be limiting the shape of the illuminator in the asserted patents based on specific limitations of an "illuminator" found in claims of other patents in the family. However, when looking at the use of the term "illuminator" across the patent family, it is clear that the patentee has not acted as its own lexicographer to define the term "illuminator" to have a specific narrow meaning. As one example, U.S. Patent No. 6,709,446 claims an invention directed to an "illuminator" that comprises "an arc-shaped portion" and that is "configured to conform to a portion of a patient . . . ." Ex. C (U.S. Patent No. 6,709,446) at claim 1. As another example, U.S. Patent No. 6,233,071 claims an "illuminator" that comprises "a plurality of light sources generally conforming to the contoured surface and irradiating the contoured surface . . . ." Ex. D (U.S. Patent No. 6,223,071) at claim 1. In both of these examples, the patentee has identified further structural limitations of the illuminator to recite "conforming" to a patient or a contoured surface, but has

---

[4] An infinite plane emitter refers to an illuminator that would provide substantially uniform intensity of light across the entirety of the active emitting area, without a decrease in intensity at the edges, for example, of that illuminator.

not redefined the term "illuminator" itself to require a certain shape. In other words, when the patentee intended to require a particular shape or structure, it explicitly said so with additional claim limitations. Under the well-accepted principle that claim terms should be interpreted consistently across a patent family, applying Biofrontera's proposed construction would render these further recited limitations superfluous. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006) (refusing to construe claim terms in a way that made other limitations meaningless).

**B.**     **"Plurality of light sources configurable in a spaced relationship to the patient"**

| Term | Claim(s) | DUSA's Construction | Biofrontera's Construction |
|---|---|---|---|
| "plurality of light sources configurable in a spaced relationship to the patient" | '991: claim 1 | plain and ordinary meaning | "plurality of light sources generally conforming to a contoured surface" |

Similar to Biofrontera's proposed construction of "illuminator" discussed above, here too Biofrontera attempts to improperly limit the plurality of light sources to "generally conform[] to a contoured surface." But again, the claims of the '991 patent and intrinsic record fail to provide any reason for importing such a limitation.

This term requires no further construction because the plain and ordinary meaning of this term is readily understood. *See* Zamenhof Decl. at ¶¶ 30-35. The first part of the term, "plurality of light sources," is well understood as a matter of conventional claim drafting to be more than one light source. *See id.* at ¶ 31; *see also August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1286 (Fed. Cir. 2011). The second part of the term, "configurable in a spaced relationship to the patient" refers to space between the light sources and the patient. *See* Zamenhof Decl. at ¶ 32; *see also Keurig, Inc. v. JBR, Inc.*, No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 40341, at *15 (D. Mass. Mar. 22, 2013) ("[T]he Court is not required to provide additional language construing a claim if its

ordinary meaning can be readily understood by a layperson and adopting it would resolve the parties' dispute concerning interpretation"); *see also id.* at \*16 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.") (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005)). Nothing in the plain language of the claim requires any specific arrangement or spacing—only that *some* spaced relationship to the patient may be configurable. *See* Zamenhof Decl. at ¶¶ 33-35.

### C.       "All operation distances"

| Term | Claim(s) | DUSA's Construction | Biofrontera's Construction |
|---|---|---|---|
| "all operation distances" | '289: claim 1<br><br>'991: claim 11 | plain and ordinary meaning | indefinite |

DUSA proposes that the Court adopt the plain and ordinary meaning of this term, as a POSITA would understand its definition in these inventions. Biofrontera, on the other hand, asserts that this claim term is indefinite.

The claims at issue all concern photodynamic therapy. "All operation distances" simply refers to the range of distances at which the PDT device is operated in order to deliver therapy to a patient. *See* Zamenhof Decl. at ¶ 37. Because this term is well-known, moreover, a POSITA would understand its meaning. *See id.* at ¶¶ 36-40; *see also Sunrise Techs.*, 280 F. Supp. 3d at 247 (applying the standard of indefiniteness from *Nautilus* and finding "no reason to believe that a POSA would not understand the patent with reasonable certainty").

Further, during the prosecution of the '289 and '991 patents, the Examiner did not reject this term as indefinite or give any indication that it was difficult to apply the term to the prior art.

11

Even more, Biofrontera itself implicitly admitted to the U.S. Patent and Trademark Office that this term was ***not*** indefinite through its filing of petitions for *inter partes* review of the '289 and '991 patents and its argument that the term "all operation distances" is allegedly explicitly disclosed in the prior art. *See, e.g.*, Ex. E (Excerpt of Biofrontera's IPR Petition on the '991 patent) at 29, 41-42, 52, 62-63, 68; Ex. F (Excerpt of Biofrontera's IPR Petition on the '289 patent) at 22, 27, 39, 44, 55. As explained by the U.S. Patent Trial and Appeal Board, although a petitioner may not challenge the patentability of a claim due to indefiniteness in *inter partes* review proceedings, to the extent "the differences between the claimed invention and the prior art cannot be determined," the PTAB would not even institute review of such a claim. *See, e.g.*, *Facebook, Inc. v. Sound View Innovations, LLC*, PTAB, Case IPR2017-00985 (Sept. 5, 2017) (Paper 17) (attached as Ex. G) at 10-11. Here, on the one hand, Biofrontera has demanded *inter partes* review of a claim by arguing—among other things—that "all operation distances" is disclosed in the prior art. On the other hand, Biofrontera now seeks to argue before the Court that this same term is indefinite and thus cannot be applied. [5] These positions are inherently inconsistent, and Biofrontera's indefiniteness argument should be rejected for this additional reason.

To the extent this remains a live issue at trial, DUSA will introduce evidence showing that manufacturers of PDT illuminator devices provide detailed specifications with their equipment, including the distances within which the illuminator is intended to be operated. *See, e.g.*, Amended Compl., ECF No. 44-11 (Ex. 11, Excerpts of BF-RhodoLED's Manual) at 8 ("It is imperative that a distance of 5 to 8 cm from the patient must be observed during treatment . . . ."). In the event that Biofrontera comes forward with contrary evidence about typical operation distances—which it has

---

[5] Biofrontera has also requested district court-style claim construction for both *inter partes* review petitions, *i.e.* that the same *Phillips* standard apply in both proceedings, further demonstrating its implicit acknowledgement that these terms have definite meanings.

not at this point—the question would simply be a battle of the experts to be resolved by the factfinder. *See, e.g.*, *MeadWestVaco Corp. v Rexam Beauty & Closures, Inc.*, 731 F.3d 1258, 1266 (Fed. Cir. 2013) (rejecting proposed construction that was inconsistent with the ordinary meaning of a term and that injected defendant's dispute over an issue relevant to infringement, not claim construction). There is simply no reason to conclude at this stage that a person of ordinary skill, reading these claims, could not make sense of "all operation distances."

**D.** **"Uniform output of light" and "The light sources are configured and controlled to provide a uniform output of at least one of blue light and red light"**

| Term | Claim(s) | DUSA's Construction | Biofrontera's Construction |
|---|---|---|---|
| "uniform output of light"<br><br>"the light sources are configured and controlled to provide a uniform output of at least one of blue light and red light" [6] | '991: claims 1, 12 | "output of light sufficient to activate a target photosensitizer"<br><br>"the light sources are configured and controlled to provide output of at least one of blue light and red light sufficient to activate a target photosensitizer" | indefinite |

DUSA proposes a functional construction of this term that is consistent with the language of the claims of the '991 patent and with the intrinsic record. Biofrontera, on the other hand, asserts that this claim term is indefinite. However, Biofrontera presents no clear and convincing evidence for its assertion, as the claim language, specification, and intrinsic record all inform a POSITA with reasonable certainty the scope of the claimed invention with reference to this term here. *See Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1124 (Fed. Cir. 2016).

---

[6] Biofrontera confirmed on the parties' September 20, 2018, meet and confer that it contends only that the "uniform output of … light" portion of claim 12 is indefinite, and that the additional words that appear in this phrase are not at issue. Accordingly, DUSA has briefed these two disputed terms together.

13

To understand the meaning of "uniform output of light" here, the Court should consider the specification to understand how the invention functions. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("[I]t is . . . entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language"). In particular, the Court should interpret a modifier such a "uniform" in a functional manner, so that its scope is consistent with the purposes of the invention. *See id.* In short, one must look to the *reason* for the limitation. *See Exxon Research & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1381 (Fed. Cir. 2001) (interpreting "substantial absence of slug flow" in light of the reason why invention seeks to avoid "slug flow").

Here, the specification clearly spells out the reason why it is necessary for the invention to have an output of light that is uniform: "to assure that the properties of the device are suitable to deliver light to the target lesions and drive the photodynamic reaction." Ex. A ('991 pat.) at 4:29-31. To achieve this, moreover, the patent explicitly recognizes "it is highly desirable to have an illuminator with a spectral output that overlaps to a large extent with the optical activation spectrum of the target photosensitizer." *Id.* at 2:30-33.

The uniform output of light is core to the claimed invention of the '991 patent, as the efficacy and success of the PDT treatment largely depends on the output of light from the illuminator having uniform parameters. Ex. A ('991 pat.) at 4:26-33. The uniform intensity of the light ensures the activation of the target photosensitizer across the surface of a patient's skin in order to yield the therapeutic effect of the PDT treatment. *Id.* at 2:30-33; *see also* Zamenhof Decl. at ¶ 41. At the time of the invention, moreover, "[c]onventional illuminators [did] not produce visible light [that] is sufficiently uniform in intensity over a contoured surface." Ex. A ('991 pat.) at 2:42-44; *see also id.* at 4:24-31 ("The present invention differs from conventional light sources

14

because of the biological requirements imposed on a PDT light source. . . . Output spectrum, irradiance, and irradiance uniformity all must be controlled to assure the properties of the device are suitable to deliver light to the target lesions and drive the photodynamic reaction."). Thus, uniformity is essential to the purpose of the invention, and is significant to assure that the output of light in the invention is suitable to achieve the desired therapeutic result of the treatment.

Without putting forth any supporting evidence at this point, Biofrontera asserts that this term is indefinite. But the words of this claim term are not hard to understand, and would be readily understood by a POSITA in view of the functional explanation in the specification. Indeed, of the six additional patents that share the same specification, all of them included the term "uniform . . . light" in their issued patent claims; none of them (including the asserted '991 patent) were rejected by the Examiners as being indefinite under 35 U.S.C. § 112. During the prosecution of the '991 patent, moreover, the Applicant explained that the purpose of the uniform light output of the invention was to achieve the therapeutic benefit of activating the photosensitizer. *See* Ex. H, (Applicant's 2/6/17 Remarks in Reply to Office Action) at 5 ("Uniform illumination is very important because if the light is not uniform, the therapeutic effect will not be uniform."). The Applicant repeatedly made the same point regarding the purpose of "uniformity" limitations during the prosecution of related patents. *See, e.g.*, Ex. I (Applicant's 10/3/97 Remarks in Reply to Office Action) (6,223,071 File History) at 3 ("Second, the claims expressly recite that the invention produces uniform intensity visible light. This feature is very important because *for therapeutic reasons it is necessary to have uniform intensity*. The present application describes several techniques for achieving this uniformity. In contrast, in the [prior art at issue], the production of uniform intensity light is not a concern.") (emphasis added); Ex. J (Applicant's 11/12/09 Remarks in Reply to Office Action) (7,723,910 File History) at 9 ("It is also noted that claim 32 recites use

of substantially uniform intensity visible light. This feature is an important feature of the present method because ***use of uniform intensity visible light results in a uniform reaction in tissue between the light and the 5-aminolevulinic acid [i.e. the precursor of the photosensitizer], and thus a uniform therapeutic or diagnostic effect in the tissue***.") (emphasis added).

Not only did the Examiners not deem these terms to be indefinite, but Biofrontera also implicitly admitted these terms are not indefinite in its petition seeking *inter partes* review of the '991 patent. *See, e.g.*, Ex. E (Excerpt of Biofrontera's IPR Petition on the '991 patent) at 9, 10, 26-27, 29, 32, 43-45, 53, 55-56, 58, 63, 65, 68. That Biofrontera is seeking institution of an *inter partes* review and arguing that both of these terms are disclosed in the prior art is inherently inconsistent with the position it is asking the Court to take here on indefiniteness. *See, e.g.*, Ex. G, (*Facebook*, Case IPR2017-00985 (Paper 17)) at 10-11 (stating that *inter partes* review would not be instituted for claims where "the differences between the claimed invention and the prior art cannot be determined").

Thus, here, at minimum, the question posed by Biofrontera is simply another battle of the experts to be resolved by the factfinder. Accordingly, no compelling reason exists to conclude at the claim construction stage that a person of ordinary skill, reading these claims and specification, could not make sense of "uniform output of light." *See, e.g.*, *Mass. Inst. of Tech.*, 839 F.3d at 1124 (rejecting argument that the term "three-dimensional scaffold" was indefinite in view of its ordinary meaning and expert testimony).

## V.   CONCLUSION

In view of the foregoing, DUSA respectfully requests that the Court adopt DUSA's positions on each disputed claim term and reject Biofrontera's proposed constructions.

16

Dated: October 5, 2018

Respectfully submitted,

By: */s/     Adam Kessel*
    Adam J. Kessel (BBO # 661,211)
    kessel@fr.com
    Kevin Su (BBO # 663,726)
    su@fr.com
    Brendan F. Murphy (BBO # 699,503)
    bmurphy@fr.com
    Fish & Richardson P.C.
    One Marina Park Drive
    Boston, MA 02110
    Phone: 617-542-5070 / Fax: 617-542-8906

    Betty H. Chen, SBN 290588
    Admitted *pro hac vice*, bchen@fr.com
    Fish & Richardson P.C.
    500 Arguello Street, Suite 500
    Redwood City, CA 94063
    Phone: 650-893-5070 / Fax: 650-893-5071

    Jacqueline Tio, GA Bar No. 940367
    Admitted *pro hac vice*, tio@fr.com
    Wonjoon Chung, GA Bar No. 396468
    Admitted *pro hac vice*, chung@fr.com
    Fish & Richardson P.C.
    1180 Peachtree Street N.E., 21st floor
    Atlanta, GA 30309
    Phone: 404-892-5005 / Fax: 404-892-5002

    Jeremy T. Saks, NY Reg. No. 5302542
    Admitted *pro hac vice*, saks@fr.com
    Fish & Richardson P.C.
    601 Lexington Avenue, 52nd Floor
    New York, NY 10022
    Phone: 212-765-5070 / Fax: 212-258-2291

    ***Attorneys for Plaintiff DUSA Pharmaceuticals, Inc.***

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 5th day of October, 2018.

*/s/ Adam Kessel*
Adam Kessel

18