UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


  * * * * * * * * * * * * *
 DUSA PHARMACEUTICALS,        *
 INC.,                        *
              Plaintiff       *      CIVIL ACTION
                 vs.          *      No. 18-10568-RGS
                              *
 BIOFRONTERA INC., ET AL.     *
                              *
            Defendants        *
  * * * * * * * * * * * * *






            BEFORE THE HONORABLE RICHARD G. STEARNS
                 UNITED STATES DISTRICT JUDGE
                      MARKMAN HEARING
                     March 12, 2019






                                   Courtroom No. 21
                                   1 Courthouse Way
                                   Boston, Massachusetts 02210




                    JAMES P. GIBBONS, RPR/RMR
                     Official Court Reporter
                   1 Courthouse Way, Suite 7205
                   Boston, Massachusetts  02210
                    jamesgibbonsrpr@gmail.com

APPEARANCES:

     FISH & RICHARDSON, P.C., (By Roger A. Denning, Esq.), 12390 El Camino Real, San Diego, California 92130, on behalf of Plaintiff

     FISH & RICHARDSON, P.C., (By Jeremy T. Saks, Esq.), 601 Lexington Avenue, 52nd Floor, New York, New York 10022, on behalf of Plaintiff

     FISH & RICHARDSON, P.C., (BOS), (By Adam J. Kessel, Esq.), One Marina Park Drive, Boston, Massachusetts 02210-1878, on behalf of Plaintiff

     McGUIRE WOODS, LLP, (By David E. Finkelson, Esq.), 901 E. Cary Street, Richmond, Virginia 23219, on behalf of Defendants

     McGUIRE WOODS, LLP, (By Justin R. Lowery, Esq.), 800 East Canal Street, Richmond, Virginia  23219, on behalf of Defendants


ALSO PRESENT:
     Craig Kuchii

     Randall Wilhoite

     Dan Hakkansen

P R O C E E D I N G S

THE CLERK:  All rise.

(Whereupon, the Court entered the courtroom.)

THE CLERK:  Court is open.  Please be seated.

This is Civil Action No. 18-10568, DUSA Pharmaceuticals, Incorporated versus Biofrontera Incorporated, et al.

Counsel, please identify yourselves for the record.

MR. DENNING:  Good morning, your Honor.  Roger Denning of Fish & Richardson on behalf of the plaintiff, DUSA Pharmaceuticals.  And I have with me at counsel table here today my colleagues Jeremy Saks and Adam Kessel, also of Fish & Richardson.  And then behind me I have in-house counsel for DUSA Mr. Craig Kuchii.

MR. KUCHII:  Good morning, your Honor.

THE COURT:  Good morning.

MR. FINKELSON:  Good morning, your Honor.  Dave Finkelson from McGuire Woods on behalf of the Biofrontera parties.  With me at counsel table is my partner Justin Lowery, also of McGuire Woods.  And sitting behind us from Biofrontera are Randall Wilhoite and Daniel Hakkansen.

THE COURT:  Good morning.

MR. FINKELSON:  Thank you, your Honor.

THE COURT:  All right, have you agreed amongst yourselves on how you would like to proceed?

MR. DENNING:  I think we have, your Honor.

The first two terms, the "illuminator" term and the "plurality of light sources" term, are pretty similar in their proposed constructions.  So we spoke with opposing counsel.  We'll start off with those two terms, and then they'll address them in return.

And then the third and fourth terms, the "operation distances" and the "uniform output," those are the claimed indefiniteness terms, so defendant, we've agreed, will go first on those terms, since it's their burden, and we'll respond.

THE COURT:  Very well.

All right.

MR. DENNING:  And Mr. Saks, my colleague, is going to present on the first two terms, your Honor.

THE COURT:  All right.  Mr. Saks.

MR. SAKS:  May it please the Court.

Your Honor, the first term I'm going to present is "illuminator," but before I do, I'll provide some background on this invention here.

So these patents cover a novel approach for photodynamic light therapy, and these patents cover treatment of the -- treatment and a method for determining the treatment.

Now, for treatment with this invention, a lotion is

first applied to the skin, and the lotion contains light-sensitive molecules which convert into molecules known as photosensitizers when the lotion is applied to the skin.

Next, light is applied from the illuminator to the pretreated skin with the correct parameters and sufficient uniformity to activate the photosensitizers in the skin.

The photosensitizers then, in turn, facilitate the treatment by selectively targeting and treating certain diseased cells.

Now, the claims of these asserted patents here cover the illuminator device that's used in the patent as well as the method for the treatment. And looking at the words of the claims here, they demonstrate how the novel aspects of this invention are really about the configuration and control of the light sources to achieve the uniform output and not about the shape of the illuminator itself. And, in fact, a great deal of this specification here talks about this control of the light sources. Then, to note, there are also eight patents in this patent family. Numerous of these other patents specifically claim aspects of the shape of the illuminator.

Now, this control of the light source is important because it ensures that the output of light is of the correct parameters, including the sufficient uniformity in order for the photosensitizers to be properly activated and

for the treatment to have the desired efficacy.

So, now focusing on the term "illuminator," I'm first going to talk about how the construction here is a somewhat straightforward approach. The specification here is not so limiting as Biofrontera contends.

I am going to next talk about how related patents in this patent family have claim language here that helps inform how the term "illuminator" should be understood in these patents, and then I'll discuss how a sentence in the specification concerning "flat light emitting surfaces" is not limiting of the claims here, as Biofrontera has argued.

Now, Biofrontera wants to make this dispute about shape, but the claims of these patents do not mention shape, and the language of the claims concerning the illuminator are in no way limited by shape. In fact, what this invention is about, which is the aspect of controlling the lights in order to obtain a uniform output of light, does not concern shape.

Looking at the claims of the asserted patents here, nearly all recitations in claim 1 of the '991 patent and claim 1 of the '289 patent claim aspects and the results of controlling those light sources to achieve a desired light output.

So that really focuses on what these inventions are about, containing that novel light output, and not the shape

of the medical instrument which is emitting that light.

So it's also important to note that this is not a case of prosecution history estoppel, nor is it a case of prosecution disclaimer.  The inventors here were not acting as their own lexicographers by ascribing some special meaning to an otherwise commonly understood term.

The term "illuminator" is just that.  It's an instrument which emits light, and in the case of these patents, is an instrument used for medical treatment and specifically photodynamic therapy.

Now, Biofrontera's attempt to narrow the meaning of this straightforward word is improper, and is nothing more than a results-driven approach, and is a construction that's made in the reference to the accused device.  So we respectfully request that your Honor construe this term as commonly understood, in the same way that a person of ordinary skill in the art would understand it.

So, Biofrontera does not dispute that an illuminator is a light emitting medical instrument and that the claims here cover medical treatment from a medical device.  This is, however, a classic case of a defendant attempting to import limitations and details from an embodiment in the specification, and in this case from the preferred embodiment, into the words the claims.  This approach does not find support in the intrinsic record.

So, when the specification here discusses limiting the shape of light sources, it does so in the context of an embodiment, and there's nothing in the intrinsic record here that suggests that the invention of the asserted patents must be conforming to a contoured surface.  In fact, the language of the specification specifically discloses how the U-shaped embodiment is the preferred embodiment and is a permissive arrangement.

For example, in the abstract of the patents-in-suit here, it discloses an illuminator which may comprise generally U-shaped fluorescent tubes.

In another section of the patent in column 6, line 16 and 17 of the '991 Patent, the specification teaches that, "One embodiment of the present invention utilizes a plurality of U-shaped tubes."

Now, this type of language is repeated numerous times throughout the specification.

Now, if you look at related the patents in the patent family, we can see how the patentee understood the word "illuminator."  And then when the patentee intended to use additional language concerning the shape of the illuminator, the patentee explicitly did so.

And for this I have a handout here.  May I approach?

THE COURT:  You may.

(Document handed to Court.)

MR. SAKS:  Now, Biofrontera's proposal attempts to limit the shape of the illuminator in these patents to the shapes of an illuminator that are recited in the limitations of the claims of related patents in this patent family.

And, for example.  On Slide 2 of the handout, Biofrontera's proposal for these patents is nearly identical to the language of independent claim 1 of the related '071 Patent, which claims an illuminator that comprises, "A plurality of light sources generally conforming to a contoured surface."

And further, if you look at Slides 3 and 4, independent claim 1 of the related '446 Patent, claims an illuminator with an arc-shaped portion that is configured to conform to a portion of a patient.

And further on Slide 4, you can see that the dependent claims of the related '446 Patent go to specific formations of the illuminator.  So they claim when an illuminator is U-shaped, or where an illuminator is configured to illuminate a face, or where an illuminator in which the light sources are curved.

So, the fact that the patentee used narrowing shape language to claim "illuminator" in some claims of the patent family while purposely omitting that language from others serves to underscore the point here.  When the patentee intended to require a particular shape or structure for

"illuminator," the patentee explicitly said so.

So, accepting Biofrontera's proposal would render these further recited claim limitations in these related patents pretty meaningless, and that practice is disfavored in the case law here.

Biofrontera also cites a series of cases about claim differentiation, arguing that "illuminator" must be construed as limited to a contoured shape across the patent family.  But none of the cases deal with this situation at hand.  So while some cases Biofrontera cites, such as the *Shire* case, which talks about construing different terms used across related patents to mean the same thing, none deal with the situation at hand here where we have the same term used across the patent family, and it's the same word, and in this case it's the word "illuminator."

So, that being said, Biofrontera's logic here runs afoul of patent claim drafting, and it does not make sense in view of the plain language in the claims themselves, which, as *Phillips* instructs, is what one will look to first.

What's more is that DUSA's expert declaration confirms that a person of ordinary skill in the art would not understand the term "illuminator" to have any narrowed meaning in the art and specifically a narrowed meaning within the context of these patents.

So, as I mentioned in my other points, this construction exercise should focus on the words of the claims here and not look to the specification before looking to the claims themselves.  And the claims in these patents do not restrict any particular shape.

Now, Biofrontera also lists a series of quotes from the specifications here that use the language "the present invention" when describing various features of this invention, contending that such language discloses that these claims must be limited.  But in several of these citations, the specification discloses how, according to the present invention, there is provided an illuminator to provide photodynamic therapy of a contoured surface, not that the illuminator must also be contoured.

In another of Biofrontera's cited passages, the specification was clearly disclosing the preferred embodiment U-shaped illuminator.

So when we look at disavowal here of claim scope, there's a pretty high bar and seldom-used standard that any such disavowal must be a clear and unmistakable statement.  And the Federal Circuit has cautioned that the standard for finding disavowal of claim scope are exacting.  And this is in the *GE Lighting Solutions* case, 750 F.3d 1304.

And the Federal Circuit has also mentioned that disavowal requires that the specification or prosecution

history make clear that the invention does not include a particular feature, and this is from the *SciMed Life Systems* case, 242 F.3d 1337.

Now, the passages which Biofrontera rely on do not meet this exacting standard and do not rise to the level of a disavowal of a non-contoured illuminator.

Now, Biofrontera's case law here represent notably more extreme cases where the patentee used the term "the present invention" to define the invention as a whole; where the patentee stated, for example, "All embodiments of the present invention are..." or where the patentee explicitly defined "A closed universe," rather than using permissive language; or, where the patentee used a broad and unequivocal limiting languages, such as, "All embodiments of the present invention contemplated and disclosed herein," and then later that patentee then tried to introduce features that were not discussed in the specification at all.

Nothing in DUSA's patent specification rises to the level of a clear and unmistakable statement of disavowal.

Now, regarding the statement in the specification about prior art flat emitting surfaces, Biofrontera again attempts to prioritize the specification to construe the terms rather than first looking at the language of the claims themselves. And in its briefing, Biofrontera argues that one sentence

concerning prior art flat light emitting surface to treat the face of a patient, out of all 16 columns of this patent here, limits the claims to a contoured illuminator. But, again, nothing in the words the claims here indicates that the illuminator needs to be limited to a certain shape. And this sentence which Biofrontera relies on does not say that the invention cannot be a flat illuminator but, rather, that prior art flat light-emitting surfaces did not deliver uniform light to all contours of the face simultaneously. And that in the '991 Patent is at column 4, lines 42 to 43.

So when you go back to the claims here, there is no requirement that all contours of the face be treated simultaneously, just that light sources be controlled and configured to output uniform light.

And this sentence only concerns treatments of a patient's face, not the other areas of the body that can be treated with this invention, such as the arms and legs of a patient. And these -- you know, these other areas of the patient that can be treated can be seen in the '991 Patent, the specification, at column 1, lines 28 to 29.

And, in fact, the '991 Patent even has narrowed dependent claim, claim 10, which specifically claims a configuration of the illuminator to illuminate the face of a patient.

So, as such, DUSA respectfully requests that this Court

adopt its proposed construction for this term "illuminator," which captures how this invention is plainly understood and how a person of ordinary skill in the art would also understand what the term illuminator means as a light emitting medical instrument.

Now, moving on to "Plurality of light sources configurable in a spaced relationship to the patient."

Your Honor, my previous statements regarding the term "illuminator" are just as applicable here to this term, as Biofrontera once again is trying to limit the construction of this term to a specific shape.  But Biofrontera's proposal for this term is even more egregious, since this term is readily understood and should be construed to have its plain and ordinary meaning.

So, as a layperson would understand it, and as DUSA's expert confirmed in his declaration that a person of ordinary skill in the art would understand these words, the first part of this term "plurality of light sources" is well understood as a matter of conventional claim drafting to mean more than one light source.

Now, the second part of this term, "configurable in a spaced relationship to the patient," refers to the space between the light sources and the patient.  And Biofrontera does not dispute either of these understandings.

So, like its proposed construction for the term

"illuminator," Biofrontera here again is attempting to import details regarding shape from the preferred embodiment, "a permissive arrangement," into this term.  And its construction here again ignores additional features of the invention, such as the novel approach to control the light in order to achieve the uniform output which are discussed in the specification.

So, as such, we respectfully request this Court adopt the plain and ordinary meaning of this term.

Thank you, your Honor.

THE COURT:  Thank you very much, Mr. Saks.

Just to boil it down to its gist -- I was actually directing this toward Mr. Finkelbaum [sic], I think --

MR. FINKELSON:  Yes.  Mr. Finkelson, your Honor.

THE COURT:  Mr. Finkelson.  I'm sorry.

I am actually playing off what you just said, Mr. Saks. The argument that gives me most pause is the argument that what you seem to be doing is trying to read the preferred embodiment as a limitation in the claim.  And I'm thinking of cases like *Vulcan Engineering*, the cruciferous sprout litigation, where the Federal Circuit keeps warning us that, the claims claim.  It is true that the specifications teach, and the claim must be consistent with the specification, but typically we are cautioned against reading an embodiment as a claim limitation.  And that seems to be your strongest

argument, but also the one that the Federal Circuit is least comfortable with.

MR. FINKELSON:  And I will address that, your Honor, in my presentation.

We are not reading the preferred embodiment into the claim.  We're reading the only disclosed embodiment into the claim, and it's not just because it's the only embodiment, it's because it's described by the specification as "the present invention," which is key language in various Federal Circuit cases that I will cover with your Honor, and it's also because the specification clearly states in no unequivocal terms that flat emitters are the problems that the invention is trying to solve as DUSA --

THE COURT:  Go ahead then with the formal presentation.

MR. FINKELSON:  We do have a slide presentation, your Honor.  It's not my intent to cover all of them, but may I approach?

THE COURT:  You may.

(Document handed to the Court.)

MR. FINKELSON:  I'm going to be spend a little bit more time on these two terms than my colleague did on behalf of DUSA because I do think it's important to your Honor's question to untangle what the specification actually says and what the combination of grounds are for why Biofrontera

submits that the claims are properly construed as we have suggested.

I'm going to start, your Honor, on Slide 7.

And in Slide 7, your Honor, you see where the term "illuminator" appears in each of the two asserted patents in this case.  It's in the body of the claims of the '289 Patent, and it is in the preamble to the claims of the '991 Patent.  I'll note that the parties all appear to agree, based on the briefing and the argument I heard today, that the preamble in the '911 Patent is limiting.

Turning to Slide 8, your Honor, you have the parties' respective constructions.

Biofrontera respectfully submits that the term "illuminator" should be construed as "one or more light source generally conforming to a contoured surface."

As I will cover in detail, Biofrontera's construction is the correct one because it aligns with what the specification describes as "the present invention" because it aligns with the only disclosed and claimed embodiment in the specification and because it aligns with the specification's clear disparagement of prior art flat illuminators.

In contrast, DUSA's construction contradicts "the present invention" as set forth in the specification and finds no support anywhere in the intrinsic record.

In understanding, your Honor, how to properly construe this term, it's important to understand what the problem is that's addressed by the asserted patents.  There is no ambiguity about that.  There's no dispute between the parties about that.  The specification makes it clear.  The problem that's addressed by these patents is how to deliver uniform light over a contoured surface.

You have in front of you Slide 9.  That's an excerpt from the specification of the '289 Patent addressing this problem.

And the specification is, likewise, very clear as to what the solution of the asserted patents is to this problem.  The solution is to use an "illuminator comprising a plurality of light sources generally conforming to a contoured surface."  That's directly out of the abstract of the '289 Patent.  It's in the abstract of the '991 Patent as well.

And your Honor sees that in Figure 1 on Slide 11.  That depicts a top-down view of an illuminator conforming to the contoured surface of the patient, the one and only embodiment disclosed in the asserted patents.

Biofrontera's construction, your Honor, implements the patentee's own description of the invention.  The words in our construction come directly out of the specification itself in the abstract of both patents.

And I'll note, your Honor, counsel indicated that the specification notes at various times that there's a preferred embodiment of a U-shaped contoured illuminator. And, in fact, the abstract says, right after it says that the invention is an illuminator with a plurality of light sources generally conforming to a contoured surface, no equivocation in that language, it then says it can be U-shaped.

I will note, your Honor, that our construction doesn't require a U-shaped.  We have not read the U-shaped embodiment into the claim language.  We have read into the claim languages the specification's clear statement that it may not have to be U-shaped, but it has to generally conform to a contoured surface.

Now, Biofrontera's construction, your Honor, is dictated by the general rules of claim construction, and your Honor is well familiar with those.  I won't repeat them here.

But what's important is the goal of claim construction, and this is set forth in the cases your Honor identified as well as others from the Federal Circuit, is to get a full understanding of what the inventors actually claimed and intended to envelop within that claim.

And as your Honor noted in the *Fresenius Medical* case, the specification is always highly relevant to that inquiry.

In fact, it's usually dispositive.  This is a quote out of *Fresenius Medical* and out of the Federal Circuit's ruling in *Phillips*.  It's the single best guide to the meaning of a disputed term.

Now, your Honor, to your question and to the various bases that support our construction here, the Federal Circuit -- and I'm on Slide 14 -- has identified three primary ways that the specification can limit claim scope.

The first, and this has nothing to do with how many embodiments may be disclosed with preferred embodiments or anything, it says, "Where the specification describes, quote, 'the present invention' in a specific manner," that description of the present invention, "constitute clear and unmistakable statements by the patentee that limit the claims."

That's one basis.

Second basis:  Where the specification "describes only a single embodiment," which requires a particular feature to realize the properties that are set forth in the claims.

That's a second basis.

The third basis is: "Where the specification criticizes or disparages alternative devices," the Federal Circuit has said in the *Openwave* case, "it is difficult to envisage how ... one could read the claims of the patents-in-suit to cover such devices."

Any one of those bases can independently be a ground to limit claim scope.

Importantly, your Honor, and in direct response to your question, all three are present here, and you have to account for one, plus two, plus three, which together leave no doubt that the term "illuminator" should be construed as Biofrontera suggests.

The Federal Circuit has dealt with exactly this situation before.  I draw your attention, your Honor, particularly to the *Rembrandt* case cited in our briefs, where all three of these factors were present.  The Court found that the patent repeatedly characterized the computer recovery process that was at issue in that case of the "present invention."  It called it the "present invention" being an automated one.  There was "present invention" language.

There was only a single embodiment that was claimed. That embodiment similarly required automatic automated computer recovery.

And, finally, there was a criticism of prior art methods of recovery that involved human beings intervening to perform the activity.

Present invention plus claimed embodiment plus disparagement of the prior art, the Federal Circuit said you look at those three things together, left with no choice but

to rule that the recovery process in those claims were limited to an automated one.

And Federal Circuit did a similar thing in the *Astrazeneca* case, also addressed in our briefing as well.

Here we have all three of those limiting factors, and I want to cover each of them in a little bit more detail, your Honor.

The first is that there's no question that the specification here defines the present invention, the present invention as a whole, as light sources conforming to a contoured surface.

Now, Mr. Saks said the specification talks about a contoured surface frequently without reference to the illuminator itself.  Importantly, and I'm on Slide 18, the specification repeatedly discusses the illuminator of the present invention as being contoured in shape.

In Slide 18 you have three excerpts from the summary of the invention section of these patents.  Each of them says, According to the present invention, you need to use an illuminator comprised of "a plurality of light sources generally conforming to the contoured surface."

The shape is the present invention described by the patent itself.

And those aren't the only references.  We have two more here on Slide 19.  Another from the summary of the

invention, and another describing Figure 1 as "the present invention."

This is important, your Honor.  The Federal Circuit cases, and I'm on Slide 20, tells us that, "When a patentee 'describes the features of the "present invention'" in this fashion "'as a whole,' he alerts the reader that 'this description limits the scope of the invention.'"

The *Verizon-Vonage* case held similarly, as did the *Honeywell* case from the Federal Circuit, also set forth on Slide 20.  There the Federal Circuit said, "On at least four occasion, the written description refers to the fuel filter as 'this invention' or 'the present invention.'"  And when that happens, the Federal Circuit says, "The public is entitled to take the patentee at his word and the word was that the invention is a fuel filter."

Similarly, in this case the public is entitled to take DUSA at its word.  It told the public in the specification that its claimed illuminator was contoured in shape, and the public is entitled to take DUSA at its word, and the claim should be construed accordingly.

This district has addressed this exact scenario in the *Shire* case cited in our briefs.  And I'm on Slide 21.  The Court addressed the present invention case law from the Federal Circuit.  It noted that the patent in question there referred to the present invention as being a pulsed dose

invention.  And that reference to the present invention, coupled with the fact that the word "pulsed," much like the words "plurality of light sources conforming to a contoured surface" appeared multiple times throughout the specification, indicating the importance of that term and a ground for finding ultimately, and I'm on Slide 22, that *Shire* had limited itself to a "pulsed dose" invention.

Now, DUSA mischaracterizes, your Honor, the case law cited in our brief.

Take, for example, the *Pacing Techs*. case, which DUSA says requires the exact words "is" or "includes" with reference to the invention.

*Pacing Techs*. doesn't say that, your Honor.  It says to the contrary.  It says that language is limiting in the specification so long as what it's trying to do is describe the features of the present invention as a whole, including when it describes a feature as an important feature of the present invention.

Similarly, in *Astrazeneca* the Federal Circuit said unequivocally, Rigid formalism is not required."  We're not looking for specific, exact words with reference to the invention but, "Where the general summary or description of the invention describes a feature of the invention ... and criticizes other products ... that lack that same feature, this operates as a clear disavowal of these other products."

Similarly, DUSA comes to distinguish *Rembrandt*, saying the patent there is different because, one, it "explicitly disclosed only a single embodiment"; and, two, it used strong language to differentiate that embodiment from the prior art.

Both of those things are true, your Honor, with respect to the asserted patents.

That's the first basis, your Honor, for limiting the claims here as Biofrontera suggests.

The second basis is that the one and only embodiment disclosed by the specification and claimed is that of a contoured illuminator, as set forth, for example, in Figure 1.

Your Honor is precisely right with respect to case law from the Federal Circuit saying you need to exercise caution with respect to limiting the claims to a particular embodiment.  There is, unquestionably, Federal Circuit case law that says the mere fact that only one embodiment is claimed doesn't, in and it of itself, necessarily limit the claims.

Again, that's not what we have here.  We have an embodiment, a one and only embodiment, when viewed in the context of the language of the present invention and the disparagement of the prior art, that leaves no question that it is intended as a limitation.

The *Astrazeneca* case, cited on Slide 28, your Honor, tells us that, "The choice of the preferred embodiment 'can shed light on the intended scope of the claim,' and add further support," further support, "to [a] conclusion that the term should be limited."  That's how we're using the embodiment here, your Honor.

Similarly, in *Rembrandt* the Court found that the claimed computer recovery method was limited to an automated process in part because the only embodiment required automation and there was not a single reference to recovery with human invention in the patent.

Same is true here.  Only one embodiment.  It requires contoured shape.  Not a single reference to a non-contoured embodiment in the specification.

Now, I'll note this principle has even greater force, your Honor, when the properties in the claims themselves are specifically tied to the one embodiment.  And that's exactly what we have here.

I'm on Slide 29.

According to the specification, it's the contoured embodiment described in the specification that generates particular percentages of uniformity at 2 inches and 4 inches, and these are the properties that the asserted claims attempt to cover.

You see that here on Slide 29, your Honor.  You have

Claim 1 of the '289 Patent claiming 60 percent over all operation distances.

You have Claim 1 of the '991 Patent speaking of 2 inches and 4 inches. The support for that is the discussion of the preferred contoured embodiment in the specification itself. And the patentees confirmed as much during the prosecution practice, as set forth in the various amendments included in our briefing.

And in this circumstance the Federal Circuit tells us the embodiment has a particular limiting effect on claim scope.

A good example of this, your Honor, is the *Andersen Corp.* case cited in our briefs and excerpted here on Slide 31.

In *Andersen Corp.* the claims required particular properties of a, quote, "composite composition," unquote. That was the claim term. And according to the specification, the only source of those properties was a particular form of that composition, a pellet form or an extruded form. And the Court, therefore, held that the claimed composition was limited to that pellet-extruded form.

The same goes here. The asserted claims are limited to the only embodiment in the specification that is tied to the claimed uniformity properties; indeed, the only embodiment

in the patent at all, that of a contoured illuminator.

The third point is disparagement, criticism of the prior art. Again, a very important component of Biofrontera's position here.

The criticism of prior art flat emitters, your Honor, is clear and unequivocal. It comes in the summary of the invention section of both patents. And in that section, the patent applicants criticized as deficient the flat emitting surface illuminators of the prior art. They said, quote, "A flat emitting surface would not deliver a uniform light dose to all contours of the face simultaneously." In other words, a flat emitting surface would not accomplish solving the problem that this invention is supposedly solving.

And then three lines down you have the solution of the present invention. Again, the words "the present invention" is used to solve this problem, the problem that flat emitters couldn't solve. The patentee said you use an illuminator that is contoured in shape.

And this is in the summary of the invention, your Honor. I will also note it comes directly below a discussion in the specification in column 4 of the patents that says, Because the biological requirements of a PDT light are so important, a much higher degree of precision is required for the components of the present invention. And they quote, "To achieve this, each functional block within

the present invention comprises carefully selected and engineered components."

Then the patentee tells us what that careful selection is, what that careful engineering is, and it says, in no unequivocal terms, flat doesn't cut it.  It's got to be a contoured-shape illuminator.

The *Rembrandt* case again addressed the very same fact pattern.  There, your Honor, it was a criticism in the prior art of non-automated processes for computer recovery that the Court found supported limiting the claims to an automated process.  I'm on Slide 34.  The Federal Circuit said, "Under these circumstances, where the patent clearly distinguishes non-automated processes from the invention and makes clear that the non-automated processes do not accomplish the invention's stated objectives... the district court correctly construed the claims to require automated recovery."

That authority is directly on point here, your Honor.

Now, how serious a problem is this specification language for DUSA?  You can tell in the briefing by how little attention they tried to devote to it.  In two rounds of briefing, the only place where DUSA addresses the criticism of the prior art flat emitters in the prior art is in a one-sentence footnote in its reply brief, Footnote 2. There, and again here today, DUSA appears to attempt to

limit the disparaging statement to only being about the face or only being about simultaneous treatment. The specification, your Honor, does not bear that out.

The problem that the asserted patents are trying to solve is how to provide uniform treatment of the patient over contoured surfaces, and the deficiency that the specification attributes to flat emitters. And that section of column 4 that I just showed you applies generally to illumination over any contoured surface, and there's nothing in the specification that suggests otherwise.

Now, your Honor, DUSA makes or points to three sources in arguing against Biofrontera's construction. One is that there's a purported non-contoured embodiment somewhere in the specification. There is not.

Two, that claims in other patents in the family dictate DUSA's construction here. They don't, as I'll talk about.

And, finally, DUSA points to its expert declarations.

We would submit that none of these sources support DUSA's position.

With respect to the specification's disclosure of a non-contoured embodiment, DUSA has shifted its position as between its opening brief and it's reply brief, and I think that's telling.

In the opening brief, DUSA suggested that there is, in fact, a flat embodiment specifically disclosed, specifically

described, in the specification.  It's now moved away from that position.

In its reply brief, it shifted to the position that there may not be an express disclosure of a flat emitter in the embodiments of the specification, but there's at least an embodiment that is set forth in the specification that is agnostic as to shape and that's enough to construe "illuminator" as DUSA proposes.

Neither of those arguments comport with what the specification says, your Honor, the present invention actually is.

The asserted patents don't disclose a non-contoured illuminator.  There is no express disclosure of a non-contoured illuminator.

The two specification passages that DUSA points to are set forth in Slides 39 and 40 that I have presented to your Honor.  The first argument is a reference in the specification to "emulating an infinite plane emitter." DUSA originally suggested that that statement about emulating an infinite plane emitter connoted a non-contoured embodiment.

In fact, if you look at the specification section itself at column 6 of the '289 patent, for example, where it talks about the infinite plane emitter and emulating it, it indicates that it's a goal, it's not a design, a

non-contoured design.  And the specification states that the way that goal is achieved, the way you emulate an infinite plane emitter, is precisely by using the contoured design of the present invention.

Similarly, the reference to "generally parallel" light sources in the specification, that DUSA suggests at one point in time connotes a flat light, specifically refers to the contoured embodiment that contains parallel lights as set forth in the specification.

I've highlighted on Slide 40, your Honor, Figure 2. There you see parallel lights in what is unquestionably a contoured embodiment.  "Parallel" is being used here as it was used in the *Anchor Wall Systems* case and in the *Samson Manufacturing* case, cited on Slide 40, to mean "everywhere equal distant."  The word "parallel" is not in any way a connotation of "flat."

The argument that there is an alternative embodiment that's at least agnostic to shape and that's enough is also not supported by the intrinsic record.

And again, your Honor, the specification portions that DUSA cites themselves contradict DUSA's own position.

Here's an example on Slide 40.  DUSA points to language in the specification discussing an object of the invention. That paragraph doesn't mention "shape" specifically, so DUSA says there's enough there to support its broad reading of

"illuminator."

But if you read two paragraphs later, the specification says explicitly that in order to accomplish that object, the object that DUSA points to, how do you do it, you accomplish it by using the contoured illuminator.

The Federal Circuit also made clear, your Honor, that silence regarding the shape of the illuminator in certain portions of the specification cannot trump the clear and unequivocal express statements in the specification that the present invention is contoured.

We see that in the *Pacing Techs.* case and also in the *Andersen Corp.* case, both cited, your Honor, on Slide 42.

In *Andersen Corp.*, the Court limited the term "composite composition" to a particular form despite the fact that there were several references in the composition to the specification that didn't expressly include that limitation.  Why?  Because such agnostic references were not inconsistent with and, therefore, couldn't trump the restrictive definition that was explicitly set forth in the specification.

Same is true here.

We heard today about other patents in the family and the fact that other patents in the family should be read to support DUSA's construction.  DUSA's position on this point ignores the clear dictates of the Federal Circuit and this

court as well, and the claim differentiation cannot be used to use -- it cannot be used, excuse me, to broaden claims beyond the present invention itself.  And, in fact, the very argument that DUSA presents here, relying on other patents in the family, was squarely addressed and rejected by this district in the *Shire* case.

If you look at Slide 45, your Honor, there, just like here, the patentee pointed to language in other patents in the family and said that should be informative and should support a broad reading of the claim term at issue in the patents-in-suit.  This district in *Shire* said, no, the doctrine of claim differentiation had to bend to the clear description of the present invention of the patent and specifically held that "Differently worded claims in the two patents may be capable of identical construction."

The last point I will make, your Honor, on this term is DUSA's reliance on its expert declaration to support its construction of "illuminator."  I don't think a lot needs to be said on this because, frankly, DUSA's expert didn't say a lot.  He said all of two paragraphs on this term.  They're in Paragraphs 28 and 29 of his declaration cited on Slide 46.  This is the entirety of DUSA's expert opinion on "illuminator."  Essentially, I agree with DUSA.

DUSA's expert doesn't address "the present invention" language in those two paragraphs.

He doesn't address the sole, contoured embodiment in those two paragraphs and the fact that it's tied to the uniformity properties of the claims.

He doesn't address the specification's criticism of flat illuminators.

In fact, he doesn't cite any intrinsic evidence at all.

And the case law is clear in those circumstances that expert testimony like that is properly disregarded whether you're talking about claim construction, your Honor, or, frankly, any other aspect of the case.

So, going back to your Honor's original question, Is it just the embodiment, and are we trying to read that embodiment into the claims, the answer to that is, no.

There are three reasons that together, in our views, mandates the construction that Biofrontera has proposed: "The present invention" is repeatedly described, including in the summary of the intervention, as a contoured illuminator; the sole embodiment disclosed and claimed is a contoured illuminator; the specification disparages expressly non-contoured illuminators.

You put those together, and "illuminator" should be construed, we submit, as "one or more light sources generally conforming to a contoured surface."

Before I turn in much, much more brief fashion to the "plurality of light sources" terms, does your Honor have any

questions for me with respect to "illuminator"?

THE COURT:  No.  That was a very thorough response to the question I asked.

MR. FINKELSON:  Thank you, your Honor.

As the parties agree, the term "plurality of light sources configurable in a spaced relationship to a patient, which appears in Claim 1 of the '991 Patent, should be construed consistently with the contoured illuminator construction.

You see here on Slide 51 is the parties' competing construction.  The reasons supporting Biofrontera's constructions are the same as the reasons supporting its construction of "illuminator."  And, similarly, the deficiencies in DUSA's approach mirror the deficiencies of its approach on "illuminator."

As I said, DUSA does not dispute that the two terms should be construed consistently.

Moreover, we know, from the *In re Body Science* case from this district, the fact that "illuminator" is used in the preamble of the '991 Patent "informs the construction of the term that appears in the claim body," here the term, "plurality of light sources configurable in a spaced relationship to a patient."

As with "illuminator" the '991 Patent time and time again describes the plurality of light sources of the

invention as contoured.

Similarly, the grounds supporting Biofrontera's construction of "illuminator" -- the other grounds, excuse me -- apply with equal force to the "plurality of light sources" term.

The claimed uniformity requirements are tied to the plurality of light sources generally conforming to a contoured surface, which is the sole embodiment.

We have the disparagement of flat light sources in the specification. And again, DUSA's conclusory expert declaration, in fact, just simply parrots word for word in places what's set forth in DUSA's brief, and includes no citations at all to the intrinsic record and, therefore, should be disregard.

Unless your Honor has any questions on that term, I will turn the podium over to my colleague to offer any rebuttal.

THE COURT:  Thank you very much.

MR. FINKELSON:  Thank you.

THE COURT:  Mr. Saks.

MR. SAKS:  Thank you, your Honor.

I will just make some quick points in rebuttal to what counsel for Biofrontera has stated.

So, regarding the alternate embodiments here, contrary to Biofrontera's arguments that the specification here

doesn't disclose any more embodiments than just the preferred embodiment, I point you to a section of the specification of the '991 Patent, column 3, lines 43 to 51.

And in this section it focuses on here the patent -- the patent focuses on the invention of the nature of the light, the uniform output of the light. And the specification here teaches: An illuminator, which comprises an emitting area which has a perimeter, and which has a plurality of light sources that are generally parallel to one another and that are adapted to irradiate uniform intensity of light from the emitting area. And further, that the lateral spacing between the light sources varies with respect to the perimeter of the emitting area.

Now, in this description of an illuminator, the specification does not teach any restriction as to the shape of light sources so long as the light sources are variably spaced and generally parallel to one another and so long as the light is irradiating uniformly from the illuminator.

Now, Biofrontera argues that this variably spaced parallel arrangement of light sources must be limited to a contoured design, and it's cites case law. And we saw in the presentation law that supports a contention that contoured shapes must be arranged in parallel here.

But Biofrontera's argument here is misplaced, and the parties don't dispute that things that have contoured or

U-shaped designs can be arranged in parallel.  But what Biofrontera ignores is that this section of the specification here does not recite any shape limitations, but again, only that the light sources be parallel, variably spaced, and adapted to irradiate the uniform light.

I also pointed you to additional parts of the specification in column 8 and parts of the '991 Patent which focus on electrical features of the invention, specifically, column 8, lines 27 through 33, lines 35 through 38, and lines 41 through 46.

So these additional embodiments here focus on the electrical features for various methods to control the configurable light sources in order to obtain the novel uniform output of light.  And a certain shape again here is not required.

So these embodiments disclose, for example, controlling the voltages to the ballasts of the light sources, regulating the current to the light sources, or the use of a microcontroller system for automatic voltage adjustment to the ballast.

Again, these embodiments go to controlling and configuring the light sources of the illuminator to obtain that uniform output of light and not to the shape of the illuminator.

Now, the Court recognized that the Federal Circuit has

cautioned against importing embodiments, and the preferred embodiment in this case, into the scope of the claims and we agree here.

As I stated in my opening presentation, the patent specification here uses very permissive language when describing the U-shaped embodiment, that it may on its one embodiment of the patent here, and that the patent here, the specification, a large majority of it, does focus on that control, the electrical features that control the light in order to obtain the uniform output.

Now I'll touch briefly on some of the points made by Biofrontera's counsel about flat illuminating surfaces.

Again, this is in the '991 Patent in column 4, lines 42 to 43.  And again this line here, this one sentence, is limited to the treatment of the face and limited to a treatment that's all occurring simultaneously.  Neither of these two requirements, a face and the simultaneous treatment requirement, are in the claims.  So, if you look back to the claims here, none of those aspects are required by the plain language of the claims here.

And to address the point about *Shire*, and this is something I had also mentioned, but the *Shire* case really did deal with differently worded claims and related patents and how differently worded claims can be construed to have the same moaning.  And that is just not the situation at

hand here.

We have the same word used across the patent family here in related patents, and that word should be understood the same way across the patent family.  And there's case law from the Federal Circuit that supports such an understanding.

And, lastly, I just want to mention the points that Biofrontera's counsel makes regarding the expert declaration.  You know, they mention that our expert declaration here is very short.  But I think what's important to note is that our expert declaration here does focus that a person of ordinary skill in the art here would not understand that these terms -- this term "illuminator" or the term "plurality of light sources configurable in a spaced relationship" here, a person of ordinary skill does not understand these terms to have any sort of narrowed or limiting meaning.

So again, we respectfully request that your Honor adopt the way the term -- the construction of these terms the way they are readily understood.  For an "illuminator," that being a light emitting medical instrument.  And for "plurality of light sources configurable in a spaced relationship to the patient," that being the plain and ordinary meaning of those terms.

Do you have any questions, your Honor, about these

terms?

THE COURT:  No.  Thank you.

MR. SAKS:  Thank you, your Honor.

MR. FINKELSON:  Your Honor, may I briefly address those points in three minutes or less?

THE COURT:  Yes.

MR. FINKELSON:  Your Honor, on multiple occasions now, counsel for DUSA has referred to the specific control and electrical features discussed in the specification of these patents.  I'll note for your Honor that the '289 Patent in question, the claims of those patents, don't mention or refer or relate to control in any way, shape, or form.

And with respect to the '991 Patent and the '289 Patent, both of them, neither of the claims that we're talking about here contains any of the control and electrical features to which counsel has referred to. They're simply not relevant to the discussion that we're having here.

Briefly, with respect to column 3, DUSA would have this court read a discussion in column 3 that is silent as to the shape of the illuminator as being an expressed disclosure of a flat illuminating surface, or at least as support for reading the claims to cover a non-contoured illuminator.

To do that, you have to read that language in

Section 3 -- in column 3, rather, and completely ignore the language that is directly next to it in column 4, where the specification says flat doesn't do it.  Flat is the prior art.  Flat tried to solve this problem and it couldn't.

And the important language, your Honor, starts in column 4 of the '991 Patent on line 24, and it goes all the way through line 49, directly next to the column 3 link that DUSA has just cited to this Court.

And in column 4 it says because of the biological requirements of PDT, you have to be very specific and precise about the illuminator that you're using.

And then it says this isn't specific to any particular part of the body that we're talking about illuminating. It's about any contoured shape of the body.  It says, "The inverse square law of optics states that the intensity of light from a point source received by an object is inversely proportional to the square of the distance  from the source."  Quote, "Because of this behavior, distance from the source is an important variable in all optical systems. Thus, in order to achieve uniform facial or scalp irradiation, variations in output irradiance with distance must be minimized."  And then it says, the key language, "A flat emitting surface would not deliver a uniform light dose to all contours the face simultaneously because the non-planer facial and scalp surfaces could not be placed at

a constant distance from the emitting surface."  I'm reading from the specification.  And then the last sentence, To ameliorate this problem, the present invention -- "the present invention" -- uses a contoured-shape illuminator.

There's simply no way to read the silence as to shape in the column 3 excerpt as covering flat emitting surfaces, when in the very next column the patentee tells us that flat emitting surfaces don't work.

And again this situation is very similar to the one presented in the *Pacing Technology* and *Andersen Corp*. cases on Slide 42 that I referred to earlier today.

Unless your Honor has any other questions --

THE COURT:  No.

MR. FINKELSON:  I believe my colleague, Mr. Lowery will now address the first of the terms that Biofrontera submits should be declared indefinite.

Thank you, your Honor.

THE COURT:  Mr. Lowery.

MR. LOWERY:  Thank you, your Honor.

We're currently on Slide 56 of Biofrontera's presentation.  It's continuing on from where Mr. Finkelson left off.

And the first term that we're addressing is "all operation distances" with respect to the definite issues. It appears in two different claims, claim 1 of the '289

Patent, the only independent claim of the '289 Patent, and claim 11 of the '991 Patent, one of the dependent claims there.

And with respect to claim 1, it's a pretty critical limitation because that limitation that's listed there is the only limitation.  This is the entirety of claim 1 of the '289 Patent.

And both claim 1 and claim 11 mention it in pretty much the same way, talking about "60 percent of the measured maximum over all operation distances."  So "all operation distances" is defining the space that we're looking at for uniformity or, in this case, for 60 percent of the measure maximum over that.  So what space we're looking at is kind of of critical importance for understanding what illuminators would be infringing of claim 1.

Now, on Slide 57, as has been stated, Biofrontera contends that this is indefinite.  There's no real support for "all operation distances" in the specification.  There's nothing that tells us what that means.

DUSA had put forth no construction, just plain and ordinary meaning.

Now, as Mr. Finkelson just mentioned, the patent emphasizes that distance is an extremely important variable in all optical systems because of something called the "inverse square law," which essentially means the further

away you get from a light source, the more of a drop off there is in the intensity of light. So, if you're looking at a broader space, or if you're moving further away from a light source, that intensity's going to drop off to such a level that it's very difficult to maintain uniformity. And because of this behavior, distance from source is an important variable.

So it admits up front that distance is really what they're looking at. Distance is key here.

But, in contrast, the asserted patents contain only a single mention of the term "all operation distances."

Here on Slide 59 is the only mention that we have of this term in the entire patent. And it repeats the exact language in the claim, just stating, "Within 60 percent of the measured maximum over all operation distances." It doesn't tell us what that term means. It doesn't tell us how to use it. It doesn't tell us how they came up with this number. It just says this is what they found in their preferred embodiment.

Now, we have listed on the next set of slides, starting on Slide 60, kind of a basic example showing why this is so important for understanding infringement of an accused device.

Here, just with a basic point light source coming out with the light dropping off fairly rapidly as you get away

from the light source or as distance expands.

Now, on Slide 61, one option that DUSA has proposed is we can look at the recommend distances of operation by the manufacturer.  Look at the manual.  See what they kind of recommend people use this device at.  Use that as your operation distances.

Another option that DUSA's proposed is, Well, what's used in practical usage?  What would actually be out there?  And that is kind of a different perspective.  Now we're moving from the manufacturer to a doctor or clinician. What would they be using this, sort of, device at?  How would they be operating it?

And then on Slide 63, we also have, kind of, the full operational range for the detection of light.  How far out can you move from a device and detect light?  How far out could you use this device in different circumstances?

All of those are going to have different results.  And because distance is such an important variable, all of those are going to result in different infringement analyses and, likely, a different finding of infringement versus non-infringement.  What space you're looking at is extremely important for understanding what infringes.

And, importantly, as we indicate on Slide 64, the intrinsic record does not indicate which, if any, of these is claimed.  All we have is just a mention of "all operation

distances."

Now, on Slide 65, as we've indicated, DUSA in their reply brief has made kind of an interesting admission.  What they've stated is that depending on how you use one of these devices, you're going to need different precise guidance for how to use it.  If you, for example, use it for treatment versus diagnosis, you're going to be using the device a different way.

Similarly, depending on the type of photosensitizer you're using, the type of drugs you're using, depending on the type of treatment you're using, there's going to be different guidance that a doctor is going to need in order to understand how to use it.  So there's going to be different analyses for different types of devices and different types of treatment.

And the claims encompass both options.

They state in the preamble of claim 1 of the '289 Patent both diagnosing and treating a patient are things that they're encompassing.  And they don't limit it to any particular photosensitizer or anything else.  It just broadly encompasses "all operation distances," these uniformity requirements.

The Federal Circuit has indicated in the *Haliburton* case that this is a hallmark of indefiniteness.  Anytime an artisan is going to have to make a separate infringement

determination for every set of circumstances and when such determinations are going to result in differing outcomes, sometimes infringing sometimes not, that construction is likely to be indefinite.

So, because we have such a broad range of things that are captured and because depending on what we're looking at, depending on the particular situation we're looking at, there's going to be different results that indicates indefiniteness.

Now, the other major issue here, as we list on Slide 66, is claims are supposed to have discernable scope drawn from the specification. That's the first place you look. And claims, therefore, must be viewed in terms of the specification and prosecution history, according to the *Nautilus* Supreme Court decision, which kind of reset indefiniteness.

And according to *Allvoice* from the Federal Circuit, the first thing you should be looking at is, Does a person of ordinary skill looking at the specification understand what this term means? And here we have a bare mention of the term and no definition of it.

Likewise, if there are multiple methods to interpret a claim term, as listed on Slide 67, the Supreme Court -- the Federal Circuit has indicated that that is, again, a hallmark of indefiniteness that will render a claim

indefinite.

If you have multiple measures that you can look at for a term, and all of them are going to have different results, that's going to indicate indefiniteness.  And here, as listed in these cases before, the specification provides us were no details of how we should be interpreting the term.

Now, DUSA's own cases also support indefiniteness here.  Listed on Slide 68, they have relied in their reply brief on the *Sonix Tech.* case for the contention that "a patentee need not define his invention with mathematical prescission," which is correct.  You don't need to have exact math numbers in there to tell you what you're looking at.

However, what *Sonix Tech.* emphasizes is that the intrinsic record must provide a meaningfully precise standard.  You don't have to use exact numbers, but you need something in the specification to go on.

They provide, for example in that case, that the specification included examples, included procedures for selecting those examples.  It included guidance and points of comparison for skilled artisans.  It included something that somebody could latch onto to determine what the scope of the claim term meant.

Here we don't have any examples, procedures, guidance, points of comparison.  We just have one mention of the term,

and that mention of the term is in the context of their U-shaped preferred embodiment, which again creates the issues we're having here.  Because for a U-shaped embodiment, such as DUSA's, for the preferred embodiment that they have there, you have a defined operation space. Somebody's head is going to be wrapped around in a U-shaped device.  It's not really difficult to understand what space you're talking about there.

You don't have any sort of defined space when you're looking at a flat emitting device.  You have, instead, just extending outward, that you could put somebody at any distance with respect to that device.

So, because you don't have that sort of defined space, it kind of creates the issue we have here.  It kind of also illustrates the difficulty in applying this invention over --

(Reporter interrupts.)

MR. LOWERY:  Apologies.

It illustrates the difficulty in applying this sort of invention to a flat emitting device such as the one accused here.

And with that warning, I am done with my presentation.

If you have any questions, your Honor --

THE COURT:  Would you accept the 2-inch to 4-inch as a limitation?

MR. LOWERY:  I think the issue there is that the 2-inch to 4-inch limitation is separately claimed, and so it seems it would be difficult to move from one to the other from "all operation distances," which has a 60 percent different measurement, to the 70 percent uniformity measurement of the 2-to-4-inch limitation.  So, I don't know that we would be able to translate one to the other.

That's certainly the only example of distances they've put forward there, but I don't know if that would be captured by that claim language or what that -- if that's what that claim language represents from the specification.

THE COURT:  Okay.

MR. DENNING:  Good morning, your Honor.  Roger Denning on behalf of plaintiff, DUSA.

May it please the Court.  I'm going to address the last point that your Honor raised and give our response to that, and then I will start at the beginning of the presentation.

I actually think 2 inches to 4 inches would be an acceptable construction of "all operation distances."

Counsel talked about a claim differentiation point, but the claims talk about at 2 inches and 4 inches.  At the 2-inch point and the 4-inch point, it needs to be 70 percent.

Something that says 60 percent at all points between and including 2 inches and 4 inches would be a different

limitation than at 2 inches and at 4 inches because it would include all of the points in between.  So I don't think there is a claim differentiation problem with that, and I think that would be an acceptable construction of "all operational distances."

Unless your Honor wants to follow-up on that, I will go to the beginning of my prepared remarks.

THE COURT:  Very well.

MR. DENNING:  So, DUSA proposes simply that the term "all operation distances" -- it's plain language, it's plain English, it's easily understood -- should be given its plain and ordinary meaning.

We did indicate in our brief what we think that plain and ordinary meaning is, which is simply the range of distances over which the photodynamic therapy device is designed to be used.  Pretty simple.  All operation distances.  What are the distances that this device is supposed to be used?

As medical devices, you know, illuminators are designed to be used a particular distance from the surface of the skin, and they all include in their user guides, in their instructions to the medical personnel using it, what distances those are.

The patent gives the example that your Honor just raised of 2 inches and 4 inches.  The accused device in this

case is designed to be used between 5 centimeters and 9 centimeters.  Those things are documented in the user guides and medical literature.

So it's easy.  One of skill in the art would say, Well, what is the particular operation range for this device? Let's look what it says in the materials.  Five centimeters to 8 centimeters, 2 inches to 4 inches.  That's what's meant by "all operation distances."

Counsel talked about how the claim talks about both diagnosis and treating.

The accused device in this case is used only for treating.  That distinction really isn't going to come into play in this case.  It's used only for treating, and they give a range for treating.

But, more importantly, the defendant hasn't introduced any evidence showing that it would be different for any device whether you're doing diagnosis or treating? Absolutely no evidence in that part.  They just raise the idea that it could be different for diagnosis, could be different for treating.

If it were, that would be in the instructions for use. It would say, For diagnosis use it between this range; for treating, use it between this range.  That would be exactly what we're talking about, the "all operation distances."

The claim language in both of the two patents talks

about the measured output over an active emitting area within 60 percent of a measured maximum over all operation distances.  That's how this term is used in the claim.

And simply what that means is if you have an emitting area, and I'm going to us my phone here for demonstration purposes, but imagine this is the illuminator.  It has an active emitting area that is, you know, roughly the shape of the illuminator.  And when you apply it to a treatment area, all areas within that active emitting area should be within 60 percent of the maximum within that area.

And you simply do that at the minimum operating distance, so, in the patent example, at 2 inches.  You do it at the maximum, in the patent example, 4 inches.  And you do it at the distances in between.  And if every place within the emitting area is a within 60 percent of the maximum for each of those distances, then the claim limitation is met.  It's quite simple.

So, rather than submitting a construction, Biofrontera is here urging that this claim limitation be declared indefinite.  It's a very high burden, clear and convincing evidence, to show that a claim is indefinite and invalid.  Because of that, I'll note, courts frequently defer decision on indefiniteness until later in the case once there's been a record established and expert evidence in the case, including courts in this district.  But

regardless, it requires clear and convincing evidence from the defendant to prove this defense.

Here, Biofrontera has submitted no evidence whatsoever. There's no evidence in the record from Biofrontera saying that one of ordinary skill wouldn't understand what the simple term "all operation distances" means. No declaration from an expert, no deposition testimony, nothing that talks about how people don't understand what "operation distances" means. In fact, there's no record whatsoever to support the finding of indefiniteness.

The only evidence is from DUSA, and it's on the other side, which is that one of ordinary skill in the art actually would understand what this term means, and that's the declaration that we submitted with our claim construction brief from our expert, Dr. Robert Zamenhof. He's a Ph.D. in nuclear engineering and applied radiation physics from MIT, and he has 40 years of experience in medical physics and, in particular, with radiotherapy, which is using light-based therapies and ionizing radiation, like photodynamic therapy.

And he says in his declaration that one of skill in the art would understand what the claims mean. He says, I understand "all operation distances" refers to the range of distances at which an illuminator is operated in order to deliver therapy to a patient.

He says, "In practice" -- that's Paragraph 37 of his declaration.

In Paragraph 38 he says, "In practice, the manufacturer provides guidance to users of their devices as to appropriate distances between the device and the patient."

And in Paragraph 39 he says, "It is my opinion that this term 'all operation distances' is well known and a person of ordinary skill in the art readily understands its meaning."

So, in weighing the evidence between Biofrontera and DUSA, Biofrontera clearly hasn't met the clear and convincing evidence standard because it has none, and DUSA is the only -- has submitted the only evidence to the Court on this issue.

But not only does the plain and ordinary meaning of this term compel the construction that DUSA has proposed, not only does the expert say that that's what it means, but actually Biofrontera itself has said that's what this claim language means.

Biofrontera had filed an IPR petition against both of the patents, the '289 Patent and the '991 Patent, in this case.  There the '289 Patent petition is Exhibit F to Mr. Saks' declaration which we filed with our claim construction brief.  In that IPR petition, Biofrontera argued that various prior art reference meet each and every

limitation of the asserted claims, including the "all operation distances" terms.  They didn't say that, We don't understand what this term means.  They didn't say, This term is indefinite, and of course they can't do that in an IPR petition.  You can't raise indefiniteness arguments.  But they said, actually, we know what this claim term means.  They applied it to the prior art.

And on page 44 of the petition, this is particularly instructive on this point, they were addressing a Levin or a Levin reference, and they were trying to apply the reference to the claim terms including the "all operation distances" claim term, and they said this, quote, "To the extent Levin does not expressly disclose specific operating distances, a POSITA would have known and, by this teaching, would have been motivated to use whatever operation distances appropriate for treatment."

That's exactly what we are talking about here.  The operation distances are what you use for treating the patients.  And that's what Biofrontera urged the PTAB to apply when they were looking at the Levin reference, and that's the same thing that we're proposing here.

Now they come into this court and say, No, we don't understand what it means at all, and that's 180 degrees from the position that they took in front of the PTAB, the executive branch of this government.

Unless your Honor has any questions from me on this point, I will allow rebuttal.

THE COURT:  No.  Thank you.

MR. DENNING:  Thank you, your Honor.

MR. LOWERY:  Thank you, your Honor.  Just a few brief points and then, unless counsel has any surrebuttal to that, we can move on to the last term.

Now, the first issue, just to kind of go back to your Honor's first proposal in terms of the 2- and 4-inch limitations, the claim we were specifically referring to was claim 19 of the '289 patent, which does cover distances between 2 inches and 4 inches.  So, the claims and the specification do seem to distinguish between 2 and 4 inches, which they say is 70 percent, and "all operation distances," which they say is 60 percent.  So that's what we think creates the claim differentiation issue.

The second point with regard to the evidence we've presented.

I think the record evidence here is the specification and the claims, as is appropriate.  That's the first place you should be looking to see if a term is defined is here.  That term has no support.  It has no definition.

In contrast, you can't have an expert come in and fill in where there's a gap in the specification.  That's what the Federal Circuit has said, is, if something is not

defined in the specification, if there are multiple ways of understanding a term, you just can't have an expert come in.

For example, in the *Honeywell* case the Federal Circuit found there were multiple methods for understanding or computing something, and the expert tried to come in and say, well, this is the method I would use. And the Federal Circuit said, no, you can't do that because how would a person of ordinary skill coming into this specification understand that? It's just what plaintiff's expert happened to say, which is likely self-serving for their purposes in the case.

And lastly, with respect to the IPR, just to address that issue.

I think the definiteness or indefiniteness of these claims actually got used against us in the IPR, both by the patent owner and by the PTO. Because most of our references, what the PTO said was, we don't understand how you would apply "all operation distances" to this. There are multiple ways we could think of to apply it; and because we don't have anything to apply it here, we can't apply it to the claims, so we're rejecting your grounds.

And actually what happened at the PTO is the PTO rejected multiple of our grounds because of the "all operation distances" issue.

With respect to the Levin reference, which counsel

mentioned, that was another U-shaped reference.  That was a chamber that goes all the way around the body.  And for that reference the PTO actually found, yes, we do think this limitation is met here.  And, in fact, we think claims are more likely than not invalid in view of Levin because we have a defined operation space.  We know where it's operating.  That's what we can look at.  And what Levin tells us is that there's uniformity throughout that chamber.

With respect to the other references, because we didn't really understand how this claim was going to apply, we tried to put forth a number of different references that disclosed different aspects of the claim.  That was where the PTO found they didn't understand how to apply this claim term.

Unless your Honor has any questions?

THE COURT:  No, you addressed the PTO point.  That was the one I'm curious about.

MR. DENNING:  Your Honor, if I may, I want to very briefly address that last point with regard to the IPR petitions.

The decisions not to institute the IPRs that the PTAB issued on both the '289 and the '991 have come out since the briefing on the claim construction issue has been decided.  So that's why your Honor doesn't have it as part of the record in this claim construction.  But in both cases the

PTAB decided not to institute the IPRs against the '991 and '289 Patents.

In particular, on this issue though of substantial -- I'm sorry -- of "all operation distances," the PTAB, following the argument that Biofrontera made with regard to "all operation distances" in Levin, where they said that one of skill would be motivated to use whatever operation distances are appropriate for treatment, exactly the construction that we're offering here, the PTAB said that's an appropriate construction.  They said with regard to Levin, "Because all operative locations in the chamber receive a substantial uniformity of light, there is uniformity across all operation distances."

So the PTAB was able to apply -- not only did Biofrontera urge an application of this term "all operation distances," but the PTAB was able to apply it with regard to the Levin reference as well, which is just further indication that this is not an indefinite claim term.

And that's all I wanted to add about the IPRs, your Honor.

THE COURT:  All right.

MR. DENNING:  Thank you.

MR. LOWERY:  So, your Honor, we will turn to the last term, "uniform output of light," which begins or Slide 70 of Biofrontera's presentation.

"Uniform output of light" only appears in the '991 Patent.  It appears in claim 1 of the '991 Patent, and it appears in claim 12 of the '991 Patent in slightly different contexts, but in both circumstances talking about the uniform output of light generally, and it being measured at certain distances, or being an output of blue light and red light in the context of claim 12.

Now, Biofrontera has again stated this claim is indefinite.  Unlike other claims in the '289 Patent and claims in the '991 Patent, we don't have definitions of what should be measured and definitions of how it should be measured or what percentages we should be looking at with respect to claim 1 of the '991 Patent, unlike other claims in the '289 and the '991 Patent.

DUSA has proposed a construction for this term stating that it's an "output of light sufficient to activate a target photosensitizer, though, as I'll discuss, that kind of undermines the claim term and really reads uniformity out from the claim term as a requirement.

Now, the two major questions that are unanswered by the claims listed here on Slide 72 of our presentation are: What are we measuring; and, What ranges are we looking at?

So, What output properties of light are required to create uniformity?  Are we looking at the wavelength spectrum, or color, or are we looking at the intensity of

the light; and, second, What range of those properties are required to achieve uniformity?  How broad of a color spectrum can we have?  How much can the color vary within the light?  And how much variance in intensity can there be and have it still be uniform output of light?

And both of those are, again, critical measurements because we need to be able to measure this light, understand whether it's uniform or not, or a person of ordinary skill needs to, in creating an illuminator, needs to know what would and would not infringe this claim.

Now, a little bit of basic background for what those terms mean and how they would be used here.  "Wavelength" essentially represents the color of light.  Light would come out as a wave function, listed here on 73, and you measure from one peak to another to determine the length of that wave, and that defines the color as we perceive it in light.

So red light, green light, blue light, each have slightly different wavelengths, and that's how we really perceive all color in the world.

And as is indicated in the patent listed here on the bottom of Slide 73, there's actually a full electromagnetic spectrum.  So you go a little bit different in one distance in terms of your wavelength, you get into the infrared spectrum.  You go a little bit different in the other distance, you get to the ultraviolet spectrum.  Those are

all kind of broadly part of light, and those are all part of the same spectrum.  It's just a variance in the wavelength that changes light from one thing to another.

And also importantly, listed on Slide 74 and indicated in the patent, wavelength output is defined by a spectrum range.  So, you don't have light just being output as a single wavelength or a single color.  You have a range of outputs that are coming out of a light device.

So the preferred embodiment they list out here has a range of 30 nanometers.  And then they have a Figure 10 which lists out their emissions spectrum, showing the various range kind of centered around the blue part of this spectrum as they list in their preferred embodiment.

Now, listed on Slide 75 we have some of the various measurements of light in terms of intensity, how -- ways you can think about the intensity of light.

One is simply just radiant energy, the energy that is coming out of light.

Next is irradiance, which is more concentrating on the surface that light is projecting onto, so the area -- or surface unit area, and the radiant flux, or the energy that is received over time in an area, and then lastly how bright a light is.  And they're all slightly different ways of understanding the intensity of light.

Now, the primary issue we have here is that the patent

refers to multiple, different types of uniform output.  At times the patent talks about "uniform intensity and color." At times it talks about intensity.  At times it talks about color.

It uses different words attached to "uniform."  At times we talk about sufficient uniformity.  At times we talk about consistent uniformity, and at times we talk about substantial uniformity.  All are slightly different.  None of them are really defined, and none of them are actually used in the claim that we have here.  So, we don't have a great sense of what "uniformity" is in the abstract.  We only have their specific example and their specific measurements that they've provided.

For example, at the bottom of Slide 76 from the specification, they list their preferred embodiment that has a specific "irradiance density."  That's what they're pointing to.  But beyond that, we don't have how broadly this would be applied to other devices or what uniformity should be thought of in the context of other devices or other situations.

Now, on Slides 77 and 78 we have the same kind of concepts from DUSA's brief and DUSA's expert, where they varyingly talk about uniformity in different ways, both with respect to intensity and color and in different contexts with respect to sufficient uniformity or uniform intensity,

uniform parameters, and the kind of ways that would be understood under the patent. So they, themselves, have also talked about it in different ways in both the brief and in DUSA's expert declaration listed on Slide 78.

So, with that background, kind of the broader issue is even if we know what we're looking at, are we looking at color, are window looking at intensity, or are we looking at both, the issue is, What makes something uniform? At what point do we go from being uniform light to non-uniform light? And the patent doesn't give us guidance on that in the abstract. We don't know, for example, what range of wavelengths would make something uniform color or what would be non-uniform color. Is it the one specific example they've provided, or is it something else? All we have is their preferred embodiment to go off of, and they mention in the '289 Patent that color should be almost entirely in a selected wavelength range, but we don't have a broader definition that would be applied beyond the specific preferred embodiment they've put forward.

Similarly, with respect to intensity, we have claims that claim the 70 percent and 60 percent limitations. We have their specific irradiance density that they've put forward as their preferred embodiment, but we don't have a broader conception of what uniform is.

And that makes a difference because uniformity, as it

would normally be thought of, is unchanging.  Uniform would be unchanging.  So obviously it doesn't mean that here.  It has to mean some level of variation.  You wouldn't have a light that is entirely uniform.  But we don't know how much variation is allowed versus the claims where they specifically provided the 70 percent and the 60 percent numbers in terms of the uniformity.

Now, DUSA's construction, as they've put it forward, kind of sidesteps this issue.  Instead of providing ranges or numbers in terms of what you would be looking at, their construction is "output of light sufficient to activate a target photosensitizer."

And the primary issue with that is it gets around what the patent is actually trying to do.  If you're just activating a target photosensitizer, you're not necessarily providing uniform therapeutic effect, which is what both DUSA and the patent indicate is what they're looking for.  You don't want to have a center part of the light that has three times as much light energy being provided to a photosensitizer than the outside parts.  Even though the entire area might be activated, you would have entirely wildly non-uniform effects on that treatment area.  But that's allowed under DUSA's construction because it all would be activating -- it would all be sufficient to activate the target photosensitizer.

So this really can't be the construction because this would allow for wildly non-uniform effects and wildly non-uniform light.

So there has to be some actual range provided here, something that we could look at, an objective standard in terms of numbers.

And plaintiff's own citations admit that uniform effect is the goal, not merely activating it.

Now, the other issue here, as was mentioned with respect to "all operation distances," is DUSA's also indicated there's going to be different guidance depending on how you're the device and where it's being applied.  And for that reason, this, once again, has got to change for photosensitizer to photosensitizer depending on what the properties of that photosensitizer are, what's necessary to activate it, and how you'd be applying in those different situations.

So this would again be an analysis that would change based on application to application, which is exactly what the Federal Circuit has said is an indefinite term, or a term that can't really be applied.  Because if you have to look at every certain circumstance, and it would be infringing in one but not the other, that that's not really a term that could be meaningfully applied by a person of ordinary skill in deciding what sort of product to build or

what is covered by this patent.

And unless your Honor has any questions --

THE COURT:  The word "uniform," I think, is the key word, but I do not think of "uniform" as necessarily a word of measurement.  Isn't what "uniform" implies is an evenness of output, not necessarily any given level of output?

Just as we talk about armies being in uniform, well, uniforms can differ, but in one army they're expected to look pretty much the same.

MR. LOWERY:  Yes, I would agree with your Honor that "uniform" would mean evenness.  It would mean some level of, you know, either unchanging or a standard that's being applied across this area.

The issue when, kind of, we're trying to decide if a product infringes or not is we're going to be looking at numbers.  We're going to be looking at comparison of one area to another area and deciding, Is that variation uniform or is it not?

And that's where we do kind of need a standard in terms of what makes something uniform or not.  Otherwise, it's just going to be two experts, well, I think it's uniform and I think it's not, and not really having much to back up beyond their own so say.

That's why patent specifications and the Federal Circuit requires some sort of objective standard.

Otherwise, we're just going to have what they've described as this subjective, unrestrained opinion of the patent holder just coming forward and saying, well, that is what I meant by "uniform," and yours is uniform enough to me; therefore, it infringes.  Or, it's uniform enough in this situation; therefore, it infringes, which is kind of where their construction goes.

So that's the issue we have because we do, at the end of the day, need to have some sort of objective, likely numerical, measurement or range.  And that's why for other claims they have the 60 percent - 70 percent, because that's something you can analyze and look at and say whether it infringes or not.

THE COURT:  Thank you.

MR. DENNING:  Your Honor, I think you hit on the right point, which is the object of this invention, the object of photodynamic therapy, is to treat lesions on the skin, to treat the skin by activating this photosensitizer that has developed within the damaged tissue in the skin.

So you need to have a light source that is sufficiently uniform, sufficiently powerful, to activate the photosensitizer across the emitting area of the illuminator across -- and claim 1 and claim 2 talk about "across the emitting area."  Just sufficient to activate this photosensitizer is what's important here.  That's the

function behind having this uniform output of light, and that's how we think that the claim should be construed.

It's important when -- although this term doesn't appear in claims 2 and 11, I think it's important to look at claims 2 and 11 as we're construing claim 1. They both depend from claim 1, so they could be very informative as to what it means.

Claim 1, of course, talks about the light sources being configured and controlled, and that's configured and controlled by all of those things in column 7, 8, 9, 10 that my colleague, Mr. Saks, was talking about, but configured and controlled to provide a uniform output of light to the patient.

And then claim 2 goes on to say, okay, and that measured output over the active emitting area is within 70 percent of a measured maximum at distances of 4 inches and 2 inches.

So that gives you a lot of information about what property of the light we're talking about.

Counsel for Biofrontera said, well, does it mean the intensity slash irradiance of the light, or is it talking about the color of the light.

Well, when you look at claim 2 and you see that it's talking about the measured output needs to be 70 percent of the maximum, of a measured maximum, we know we're talking

about the intensity of the light, the irradiance of the light. We're not talking about the color of the light, whether it's red or blue. Instead, it's the intensity, and that you can measure. In fact, the patent, as I'll mention in a minute, expressly teaches one of skill how to measure the intensity of the light and why that's important for treating with photodynamic therapy.

The color aspect that Biofrontera's counsel was talking about appears in other claims and in other ways.

Claim 6, for instance, talks about having a blue light.

Claim 7 talks about having a red light.

Claim 12 talks about having this uniform light being either red or blue.

But when we talk about measuring that output and comparing it to the maximum, 60 percent, 70 percent, it's pretty clear it's not the color we're talking about. We're talking about the intensity or the irradiance of the light.

And again getting pack to the purpose, which is what your Honor asked counsel for Biofrontera is, well, why does that matter? It matters to activate this photosensitizer, to make the photodynamic therapy be effective for the emitting area of the illuminator. And that's why DUSA's offered the construction it's offered for this term, which is that the output of light is sufficient to activate a target photosensitizer, the photosensitizer that has

developed within the target cells.

That's consistent with the way the claims, the specification, and the prosecution history talk about the importance of the uniform output of light. And, of course, as we know from *Phillips*, we should be construing these claims in light of the claims, in light of the specification, in light of the prosecution history.

The claim language clearly ties this uniform output of light to this function of treating or diagnosing a dermatological condition. That's right there in claim 1. Right after the term "uniform output of light" is the phrase "to the patient to treat or diagnose a dermatological condition." That's what the uniform output is for. That's -- and that's -- it does that by activating the photosensitizer, which is withs what dovetails with DUSA's proposed construction in this case.

The specification also goes on to talk more about this function.

And the function is an important thing to look at when you're construing the terms of the claim. The *Medrad* case, the *Exxon* case, all say the court should look to the function of the invention to construe the claim language.

And if we look at the specification and ask the question, Why is output uniformity important, the specification tells us very clearly, it's to drive this

biological slash chemical reaction in the target cells.

Column 2, lines 29 to 30, the patent teaches, "For therapeutic reasons it is desirable to have a power output which is uniform in intensity and color."

Column 4, lines 28 to 31 say, "Output spectrum, irradiance, and irradiance uniformity" -- irradiance uniformity -- "all must be controlled to assure that the properties of the device are suitable to deliver light to the target lesions and drive the photodynamic reaction."

And it's that irradiance uniformity that the claim is talking about.

The output spectrum, the blue and the red, the colored, that's touched on in claims 6, 7, and 12.

But when we're talking about the uniformity of the light, that's this irradiance uniformity that's mentioned in column 4, lines 28 to 31.

And at various other places, as we cited in our brief, the specification is very clear that there's substantial uniform intensity of the light.

For instance, column 3 line 49 says, "The illuminator comprises an emitting area having a perimeter, and a plurality of light sources being generally parallel to one another, said plurality of light sources being adapted for irradiating substantially uniform intensity light from said emitting area."  And that's the uniform output that claim 1

is talking in the '911 Patent.

There are other similar passages.  Column 3, lines 56 to 57; a sentence starting at column 4, line 7, talks about, "to provide the substantially uniform intensity light irradiating the surface."

But we can also look at the prosecution history to understand what the inventors, what the applicants, told the Patent Office was important about the uniform intensity of the light.  And I'm looking -- we cite this in our brief.  It's Exhibit H to Mr. Saks' declaration.

But these are remarks from February 6, 2017, to an office action.  It's at page 5 of those remarks in Exhibit H.  The inventors told the Patent Office, "Uniform illumination is very important because if the light is not uniform, the therapeutic effect will not be uniform."  And it that's therapeutic effect that we think should be part of the claim construction of this term.

If the light is sufficient to be therapeutically effective across the active emitting area, then it is sufficiently uniform.  That's what the specification and that's what prosecution history teach us.

The patent also tells us how to measure this intensity, this irradiance of the light.

In column 12, lines 12 to 16, they talk about using a "visible light sensor," and it's identified as No. 120 in

the figures.  "According to the preferred embodiment of the invention, the visible light sensor 120 (e.g., a Texas Instruments TSL230B photosensor) is used to detect the tube output, and the output of the visible light sensor is used as the regulation criterion."

In column 15 [sic], lines 14 to 17, they talk about how this irradiance is the key to the dose.  They say, "Since total light dose (measured in joules per centimeter squared) equals irradiance, watts per centimeter squared times Time in seconds, the only parameter that needs to be controlled for delivery of the correct treatment light does is exposure time."

So irradiance is the important factor to be measuring here.

And that's why you have to look at claim 2 and look at claim 11.  When they talk about the measured output being within 70 percent of the measured maximum, that's talking about, you know, If you hold the illuminator 2 inches from the treatment area, is the output over that emitting area all within 70 percent of the maximum in that particular area for that distance?

Do the same thing at 4 inches.  Is the entire emitting area -- is that output, is that irradiance -- within 70 percent of the maximum at that particular distance?

It's very clear.  One of skill understands what that

means.  You measure the irradiance, as the specification speaks to, and you want to make sure that it's sufficient to activate the photosensitizer.

Once again -- I mentioned this with regard to the last term, but I'll mention again because it's of supreme importance as a matter of law -- this is an indefiniteness argument.  Defendant bears the burden of proof by clear and convincing evidence.  Once again, they've submitted absolutely no evidence on this point.  There's no testimony from one of skill in the art to say that one wouldn't understand what this claim term means.  In fact, again, the only evidence is from DUSA's expert, Dr. Zamenhof, who said he understands what the term means.  And he said, "A person of ordinary" -- this is from his declaration at Paragraph 41 -- "A person of ordinary skill in the art would understand from reading the claims and specification, in view of the intrinsic record, that the uniformity of the light output ensures the activation of the target photosensitizer across the surface of the patient's skin to yield the desired therapeutic effect of the PDT treatment."

And that's exactly the proposal that we have here.

So, once again, we have sufficient evidence by DUSA and absolutely no evidence by Biofrontera.  They clearly don't meet the clear and convincing evidence standard required to invalidate the claim as being indefinite.

And, once again, Biofrontera itself has applied this claim language to prior art.  They filed an IPR petition in the '991 patent.  In doing so, they applied this limitation to the various prior art references, the Rowland reference, the Bower reference, the Levin reference, to say that those references meet this claim language.

They said with regard to the Rowland reference, and this is at page 27 of the '991 IPR Petition, which is an exhibit to Mr. Saks' declaration, "The device is useful for applications 'where the fact that illumination is uniform and defined allow better control of the treatment process.'"

And they say again on page 27 with regard to Rowland, Uniformity occurs at distances of 2 inches, 4 inches, and at distances between 2 and 4 inches.

They quote from Rowland, saying, The modified illuminator would generate -- I'm sorry.  This isn't a quote.  This is Biofrontera saying that, The modified illuminator of their combination would generate uniform illumination within region defined by the edges of the shell.

They do the same thing with the Bower reference on page 52.  They say that Bower's LED array has uniform light intensity or power density -- that's the irradiance that we were talking about -- within 60 percent of a measured maximum at 5 centimeters and 10 centimeters.

They do the same with Levin on page 58 where they say that, In Levin the irradiance at substantially all points within the irradiation space is within about plus or minus 25 percent of the average irradiance value within said space."

So again, obviously they can't raise indefiniteness in the IPR.  But they made the election, they decided, to go in front of the Patent Office, to go in front of the Executive Branch of this government, and say that these claim terms can be applied to the prior art.

Now here they are before the Judicial Branch of the government saying we don't understand what these claim terms mean.  They can't have it both ways.

What this does, your Honor, is it raises a question for the experts, and the experts may have a spirited debate in this courtroom when we have the trial in this case about whether the accused products meet this limitation of the uniform output, but that's what trials are for; and that's what experts are for, and that's the debate that we anticipate having in this case.

But this is not a claim term that's indefinite.  It's a claim term that one can understand in context of the term, in context of the rest of the claims, in context of the specification and the prosecution history.

If your Honor has any questions, I would be happy to

address them.

THE COURT:  No.  Thank you.

MR. DENNING:  Thank you.

MR. LOWERY:  One quick point, and hopefully we'll be done for the day.

THE COURT:  All right.

MR. LOWERY:  So, the one thing I want to mention from counsel's presentation is he seems to be mixing up two concepts.  One is sufficient power.  One is sufficient uniformity.  Sufficient power to activate a photosensitizer, and sufficient uniformity, which is going to create uniform effect.

Those are two totally different things, the amount of power you need to activate something, versus having uniform effect across the entire area and uniform activation of this photosensitizer.

So, for that reason, their construction can't be right because it takes uniformity out of there.  It just changes it to "sufficient power."  Just, if we have enough, then it's fine, as long as -- even if it's wildly nonuniform among the different parts.

So even if the Court finds the term definite, it can't be construed as they suggest.

Unless your Honor has any questions --

THE COURT:  Just one last question.

MR. LOWERY:  Sure.

THE COURT:  I agree with you that they are different concepts, but can they coexist within the same construction?

MR. LOWERY:  I don't think they would be able to because they are so different.  If you're just reading them meeting a minimum threshold of activation and then you can go as far as you want above that threshold, then that's not really addressing "uniformity."  That's just addressing, Did we meet this minimum, as opposed to comparing it to the maximum, which is what happens in other claims, and comparing a maximum overall to whatever the minimum is throughout the area.  That allows you to find a band where you have uniformity; whereas, their construction essentially hits a floor but doesn't have a ceiling, so you could go anywhere above it as long as you're sufficient.

So I think that's the issue we have with it, is they are different concepts between "sufficient to activate" and "sufficient uniformity."

THE COURT:  I see the floor, but why the ceiling?

MR. LOWERY:  Because once you've activated something, then at that point they don't put any range that you could go above it; whereas, uniformity requires you to at least have some range that you're operating in such that you're comparing what the maximum and the minimum is.  You

have to have some type -- in order to have uniformity, you have to compare the area and make sure that there is not as much change between the area as would desired.  And their construction doesn't really do that sort of analysis.  It just says, Have we activated the photosensitizer?  If so, we're done with the analysis, which kind of defeats the purpose of having uniform effect across the entire area.

THE COURT:  Okay.  Thank you.

You have given me a lot of think about.

MR. DENNING:  Your Honor, I would just briefly say, I think your point is right.

There is a floor that you have to reach in order to activate this photosensitizer, but there is no ceiling, and while -- there is no ceiling.  And, most particularly, Biofrontera has not presented any evidence that there is a ceiling in this case, that there has to be some maximum above which you cannot go.  They haven't presented that at all, and the patent doesn't talk about that at all.  Instead, the patent is all about getting to the point where this photosensitizer is activated and can treat the cells that are targeted in the treatment.

That's all I have.

Thank you, your Honor.

THE COURT:  Let me thank all of you for a fine argument.

Obviously, I'm going to take the matter under advisement, but hopefully I won't be too dilatory in getting a decision.

All right.

MR. DENNING:  Thank you, your Honor.

MR. SAKS:  Thank you, your Honor.

MR. FINKELSON:  Thank you, your Honor.

MR. LOWERY:  Thank you, your Honor.

THE CLERK:  All rise.  The court is dismissed.

(Proceedings adjourned.)

# C E R T I F I C A T E

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons          January 10, 2020
   James P. Gibbons


JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jamesgibbonsrpr@gmail.com