UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-10568-RGS

DUSA PHARMACEUTICALS, INC.

v.

BIOFRONTERA INC., BIOFRONTERA BIOSCIENCE GMBH,
BIOFRONTERA PHARMA GMBH, and BIOFRONTERA AG

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON NON-PATENT CLAIMS

October 9, 2020

STEARNS, D.J.

In addition to the motions for summary judgment on DUSA's patent claims, which the court has previously addressed, Biofrontera seeks a brevis disposition of DUSA's non-patent claims. These include trade secret misappropriation under the civil provisions of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, Mass. Gen. Laws ch. 93, § 42, and the common law (Counts III-V); tortious inference with contractual relations (Count VI); and deceptive and unfair trade practices violations under Mass. Gen. Laws ch. 93A (Count VII). To prevail, Biofrontera must establish that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

*Trade Secret Misappropriation*

Massachusetts law defines trade secrets broadly. A trade secret, for example, need not be a patentable invention. *Stark v. Advanced Magnetics, Inc.*, 50 Mass. App. Ct. 226, 230 (2000). "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an advantage over competitors who do not know or use it." *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970). Confidential and proprietary information may also be entitled to protection even if the information cannot be technically claimed as a "trade secret." *Warner-Lambert Co. v. Execuquest Corp.*, 427 Mass. 46, 49 (1998) (names and addresses of employees might qualify).

DUSA alleges that Biofrontera recruited over 20 twenty of its employees who brought with them some 3,500 documents containing DUSA's proprietary information and corporate secrets, including an extensive target customer list, sales analyses, training and marketing materials, operating procedures, technical information, and unpublished clinical data. Biofrontera does not directly challenge the allegation, but rather insists that DUSA forfeited any claim of trade secret protection of the documents by failing to take "all proper and reasonable steps" commensurate with its size and sophistication to protect them. *See J.T.*

*Healy & Son*, 357 Mass. at 738; *see also* 18 U.S.C. § 1839(3)(A) (to qualify as a trade secret, *inter alia*, "the owner thereof [must have] taken reasonable measures to keep such information secret").

> No general rule may be established to determine whether the security precautions taken by the possessor of a trade secret are reasonable. "Relevant factors to be considered include (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed . . . to (any) employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered 'readily ascertainable' by the third parties through patent applications or unrestricted product marketing." *Kubik, Inc. v. Hull*, 56 Mich. App. 335, 356 (1974). Additionally, a court should consider the relationship and the conduct of the parties.

*USM Corp. v. Marson Fastener Corp.*, 379 Mass. 90, 98 (1979) (footnote omitted).

While acknowledging that each of the ex-DUSA employees had signed non-disclosure agreements (NDA), Biofrontera contends that by themselves the NDAs are insufficient to raise a trade secret aegis. *See, e.g.*, *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1334 (N.D. Ga. 2007) ("[R]equiring all employees to sign generalized confidentiality agreements is generally not, standing alone, sufficient to demonstrate reasonable efforts"

3

to maintain secrecy as a matter of law).  Biofrontera further argues that DUSA's use of other "ordinary" plain vanilla security measures fails to bridge the gap.  *See, e.g., CMBB LLC v. Lockwood Mfg., Inc.*, 628 F. Supp. 2d 881, 886 (N.D. Ill. 2009) ("While protecting databases with passwords and locking buildings that housed hard copies of Customer Information are certainly good ideas, those steps fall far short of creating genuine issues of material fact" of trade secret protection.).  Biofrontera points specifically to the following evidence of what it considers to be multiple chinks in DUSA's armor:

- DUSA did not provide annual training specific to its NDAs and did not require regular NDA renewals.

- DUSA did not provide training to employees in identifying confidential and/or trade secret information.

- DUSA did not require passwords to open, print, or transmit confidential documents.

- DUSA did not label documents containing alleged trade secrets as confidential.

- DUSA permitted employees to access confidential information from personal devices.

- DUSA did not consistently repossess confidential information and access devices from departing employees.  In one case, a former employee was permitted to keep a DUSA laptop for nearly two years after her departure.

- DUSA did not require non-compete or non-solicitation agreements.

For its part, DUSA marshals counter-evidence of its arsenal of protective shields:

- DUSA requires not only employees but also third parties to sign NDAs.  Its NDA and its Global Code of Conduct define what DUSA considers to be confidential information, including customer and vendor lists.  Like Biofrontera, DUSA treats all internal information as confidential.  DUSA reviews confidentiality as a component of its regular employee training courses, and requires employees to annually acknowledge the Code of Conduct, including its confidentiality provisions.

- DUSA employs multiple IT controls, including stringent password requirements, Microsoft Active Directory to restrict employee access to files on a need-to-know basis, mobile device management software, VPN and 2-factor authentication, various firewalls, and internal monitoring and IT training.

- DUSA reminds departing employees of their NDA obligations, terminates their DUSA accounts, and proactively seeks to secure its information.  In the case of the ex-employee who held onto her laptop for nearly two years, DUSA contacted her multiple times reminding her to return the equipment.

- DUSA utilizes access PIN codes, 24-hour surveillance, an alarm system, and restricts employees' access to its Massachusetts facility based on the scope of their job duties.[1]

In light of the relative balance of power between the competing factual scenarios, the court agrees with DUSA that the reasonableness of its steps to protect its trade secrets is ultimately a question for the finder of fact.

---

[1] DUSA also wheels up an expert witness prepared to testify that its suite of security measures were reasonable to protect trade secrets in the photodynamic therapy (PDT) industry.

5

> We do not require the possessor of a trade secret to take heroic measures to preserve its secrecy. Rather, "if the person entitled to a trade secret wishes to have its exclusive use in his own business, he must not fail to take all proper and reasonable steps to keep it secret. He cannot lie back and do nothing to preserve its essential secret quality."

*USM*, 379 Mass. 90 at 101, quoting *J.T. Healy & Son*, 357 Mass at 738; *see also* Roger M. Milgram, *Milgram on Trade Secrets* § 1.04 (1993) ("Courts can be expected to be reluctant to find an absence of safeguards as a matter of law.").

On a separate but related matter, Biofrontera contends, and the court agrees, that it is entitled to summary judgment with respect to the 3,000 or so documents for which DUSA has offered no evidence of use (or misuse).[2] For these (digitalized) documents, the metadata reflects a date of last access or modification at a time when the documents were still within DUSA's possession. DUSA points out that a file may be opened, viewed, and closed without modifying its metadata. While theoretically possible, absent some evidence (circumstantial or direct) that Biofrontera made these documents or their contents, this possibility remains stranded in the realm of conjecture.

---

[2] Biofrontera admits to making use of the remining 500 or so documents.

*Tortious Interference with Contractual Relations*

To establish a claim of intentional interference with contractual relations, "the plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991).

DUSA asserts two species of contractual interference – that Biofrontera encouraged former DUSA employees to breach their NDAs with DUSA, and that Biofrontera induced DUSA customers to breach their agreement to use only DUSA's Levulan photosensitizer drug with its BLU-U lamp. Biofrontera, for its part, maintains that the record does not reflect that it interfered with any contract "for an improper purpose or by improper means." *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 397 (1996).

With respect to the NDAs, Biofrontera notes consistent witness testimony that it never inquired about DUSA's confidential information during its hiring interviews, and did not encourage or request that the employees that it hired bring DUSA documents with them or make use of the confidential information that they had acquired while at DUSA. Within its

7

rebuttal DUSA notes circumstantial evidence leading to the opposite conclusion. In June of 2016, after a group of former DUSA employees accepted offers from Biofrontera, DUSA informed Biofrontera of the employees' continuing NDA obligations. *See* DUSA Ex. 107 (dkt # 298-47). Less than a month later, before Biofrontera had made a single sale, it ordered an ex-DUSA employee (who had access to DUSA's customer list) to create a nationwide target customer list for Biofrontera within just two days' time, a task that DUSA argues could not have been performed without referencing DUSA's existing customer list. *See* DUSA Ex. 109 (dkt # 298-49). There is also evidence that DUSA's customer list was shared with other Biofrontera employees, and that Biofrontera graded its sales staff, *inter alia*, on the use of DUSA's Account Selling Sheet, *see* DUSA Ex. 110 (dkt # 298-50). With this in mind, a factfinder might well conclude that Biofrontera encouraged former DUSA employees to exploit DUSA confidential information in disregard of their NDAs.

With respect to the second species in the tortious genus, the alleged interference with DUSA's customer contracts, Biofrontera notes that as a competitor in the PDT market, "the legitimate advancement of its own economic interest . . . is not [an] 'improper'" motive. *Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B.*, 62 Mass. App. Ct. 34, 39 (2004); *see*

*also Skyhook Wireless, Inc. v. Google, Inc.*, 86 Mass. App. Ct. 611, 621 (2014) ("[A]dvancing one's own economic interests, by itself, is not an improper motive."). DUSA alleges, however, that Biofrontera employed "improper means" in the form of unlawful off-label promotion.[3] DUSA cites evidence that Biofrontera sales staff provided free samples of Ameluz to owners of DUSA's BLU-U lights, and continued to push sales of Ameluz to customers who had indicated no interest in the purchase of a BF-RhodoLED. *See* DUSA Ex. 90, McCarley Dep. Tr. (dkt # 298-30) at 236:16-237:17. Biofrontera also provided training in the use of Ameluz to owners of the BLU-U. *See* DUSA Ex. 131 (dkt # 298-71); Ex. 87, Hendrix Dp. Tr. (dkt # 298-27) at 380:11-382:19. Approximately 78% of Biofrontera's Ameluz customers have not purchased a BF-RhodoLED. *See* DUSA Ex. 62 (dkt # 298-2) ¶ 510. This evidence, if credited, could lead a factfinder to conclude that Biofrontera engaged in improper off-label promotion of Ameluz to customers of DUSA.[4]

---

[3] DUSA's Levulan is FDA-approved for use with its BLU-U lamp, and Biofrontera's Ameluz is FDA-approved for use with its BF-RhodoLED lamp. While physicians may on their own initiative engage in off-label use, the promotion of a non-FDA-approved use by a pharmaceutical or medical device manufacturer is not permitted under FDA branding regulations.

[4] DUSA's unfair and deceptive trade practices claim, encompassing, *inter alia*, some of the same factual allegations underlying the misappropriation and interference claims, also survives.

9

*Lost Profits*

Biofrontera finally argues that because it has ample evidence that customers preferred its "superior" products to DUSA's less attractive offerings, DUSA cannot establish that it would have made all of Biofrontera's sales but for the alleged tortious conduct. The PDT market is a two-player market with Biofrontera being the late-comer. DUSA's damages expert witness explained that Biofrontera's use of DUSA's trade secrets, including its customer lists, enabled Biofrontera to bypass the high barriers of entry into the market "by selling Ameluz to customers that have never had to invest in its BF-RhodoLED device," Stec Report (dkt # 257-9) at 23, and by "identify[ing] key accounts and optimiz[ing] Biofrontera's salesforce by focusing on the key accounts to generate the largest return on investment," *id.* at 40. "Biofrontera's access to DUSA's trade secret documents, DUSA's confidential documents and information allowed Biofrontera to unfairly accelerate its business and save on time and expenses." *Id.* at 86. DUSA's theory is that, in the absence of Biofrontera's unfair acceleration gained from the appropriation of its confidential information, DUSA would have captured the bulk of PDT sales in the bisected market.[5] The court recognizes that

---

[5] DUSA's expert also offers an alternative lost profits computation based solely on Biofrontera's sales to those customers who appear on DUSA's misappropriated customer lists.

"[d]amages for lost profits are recoverable only when proof is made 'with sufficient certainty.'" *Augat v. Aegis, Inc.*, 417 Mass. 484, 488 (1994). However, "[a] tortfeasor may not complain that damages cannot be ascertained with precision when his wrongdoing caused the uncertainty." *Our Lady of the Sea Corp. v. Borges*, 40 Mass. App. Ct. 484, 488 (1996). The court agrees with DUSA that the issue of lost profits is a matter to be decided by the factfinder, should DUSA prove liability.

## ORDER

For the foregoing reasons, Biofrontera's motion for summary judgment on DUSA's non-patent claims is <u>ALLOWED-IN-PART</u> as to the subset of documents for which DUSA has no evidence of access or use, and is otherwise <u>DENIED</u>.

SO ORDERED.

<u>/s/ Richard G. Stearns</u>
UNITED STATES DISTRICT JUDGE